Hamilton Ward, J.
This is a civil action brought pursuant to the provisions of section 22-a of the Code of Criminal Procedure. This section creates a cause of action which may be maintained in the Supreme Court by certain public officers and *948 against a person, firm or corporation which publishes, sells or distributes, or is about to sell or distribute, or has in his possession, with intent to sell or distribute, or is about to acquire possession with intent to sell or distribute, any book, magazine, pamphlet, comic book, story paper, writing, paper, pictures, drawing, photograph, figure, image or any written or printed matter of an indecent character, which is obscene, lewd, lascivious, filthy, indecent or disgusting or which contains an article or instrument of indecent or immoral use or purports to be for indecent or immoral use or purpose; or in any other respect defined in section 1141 of the Penal Law. This last section also includes such matter as may be sadistic or masochistic.
The plaintiff, Corporation Counsel of the City of Buffalo, is one such public officer. The defendant Smith is a resident of the City of Buffalo and the defendant Main Street Book Shop, Inc., is a domestic corporation. The Supreme Court in Erie County has jurisdiction of this action. The constitutionality of section 22-a of the Code of Criminal Procedure has been determined by the United States Supreme Court (Kingsley Books v. Brown, 354 U. S. 436). The plaintiff may sue for an injunction against such person, firm or corporation to prevent the sale or further sale or distribution or further distribution or the acquisition, publication or possession within the State of any matter above described. The section also provides for a speedy trial and speedy decision thereafter. In the event of judgment in favor of the plaintiff, the judgment shall contain an appropriate injunction and also an order for the surrender or seizure of the contraband for destruction by the proper law-enforcement officers. Thus, in the broadest terms, the Legislature of this State has prescribed against obscene matter and provided for injunction against the destruction of such matter already in existence. It is to be noted that this section does not provide for prior restraint.
Several paragraphs of plaintiff’s amended complaint are surplusage and not the basis for injunctive relief. The essential allegations are found in paragraphs Fourth and Ninth. Plaintiff demands judgment for the relief provided for in section 22-a above. Each of the items on the list attached to the amended complaint has been received in evidence except “ Babe No. 1 ” withdrawn by the plaintiff.
By their answer the defendants admit the allegations concerning the residence of defendant Smith and that the Main Street Book Shop, Inc., is a domestic corporation and also admit the allegations contained in paragraph Fourth above and the allegations contained in paragraph Seventh which paragraph *949 sets forth verbatim subdivision 1 of section 22-a of the Code of Criminal Procedure. Although the plaintiff did not specifically allege that the defendants intended to sell and distribute the items contained in the list attached to the complaint, such allegation is implicit in the allegations contained in paragraphs Fourth, Fifth and Sixth of the complaint. Testimony was offered by the plaintiff to establish intent to sell and distribute. The defendant Smith, under questioning by his counsel, denied intending to sell items not on display in the storeroom but admitted selling certain items purchased by members of the Buffalo Police Department. The issue of intent to sell or distribute was squarely before the court on the trial and fully litigated.
It is necessary for the purposes of this decision to set out some of the evidence and matters concerning events leading up to the trial herein.
On December 5, 1962, several police officers entered the Main Street Book Shop, Inc., at 626 Main Street in the City of Buffalo and confiscated 79 cartons of magazines, books, periodicals and other publications. Thereafter a motion was brought in the City Court of Buffalo, after three charges had been placed against the defendant William Smith, the manager and operator of the bookstore, to suppress the evidence seized. The Honorable Joseph Kuszynski granted an order suppressing the great majority of the publications confiscated which were found in the rear storage room and the basement of the premises. An action was then instituted in the Federal District Court for the Western District of New York under section 1983 of title 42 of the United States Code requiring the Buffalo Police Department and other defendants to return that material which either was not charged or had been suppressed by Judge Kuszynski. Judge Henderson granted an order requiring the return of the material requested by noon of January 4, 1963. Subsequently an application was made for a stay of that order until noon January 11,1963.
On January 4, 1963, the Corporation Counsel of the City of Buffalo served upon the defendant William Smith and the Main Street Book Shop, Inc., a summons and complaint issued pursuant to section 22-a of the Code of Criminal Procedure demanding judgment that some 300 items among the confiscated material be declared obscene. Issue was joined by the service of an answer on behalf of the defendant on January 7, 1963, and thereafter a trial of the issues was immediately demanded.
A trial date was set for January 8, 1963. On the return date plaintiff served an amended complaint deleting a large number *950 of items from the list as attached to the original complaint. By permission of the court and in the interest of commencing the trial forthwith the court permitted the defendants to serve their original answer as their amended answer. On motion by the plaintiff the court released from its custody all items not listed on the list, as attached to the amended complaint, or facsimiles thereof, and directed their return to the defendants.
The defendants are awaiting trial on the criminal charges in the Buffalo City Court.
Pursuant to the provisions of section 440 of the Civil Practice Act, certain findings must be made in this decision.
I find therefore that on December 5, 1962, members of the Buffalo Police Department, acting within the scope of their authority and duty, took into their possession a large quantity of items by purchase and seizure from the defendants at 626 Main Street, Buffalo, N. Y.; that these items, and particularly those items, listed on the list attached to and made a part of plaintiff’s amended complaint, were theretofore in the possession of the defendants; that the defendants and each of them intended to sell or distribute the items set forth in the above list and that the articles set forth on the above list are specifically as follows:
1 Bound— #3; 1 Bound— #5; 1 Bound— #6; 1 Bound— #9; 1 Bound — Correspondence Issue — #1-, 2 Bound — Correspondence Issue— #2; 1 Bondage Promenade — 'Vol. 2; 2 Bondage Promenade — Vol. 3; 1 How to Tame a Roommate ; 1 Shanghaied Slaves & Cruise of Horror; 2 Lollita — Spanked; 1 Bondage Contest; 1 Bound Girl Disciplined into Submission; 2 Betty Page — Queen of Bondage; 1 Vacation at Paradise Lake; 3 Contest — Vol. 2; 4 Anita Ventura; 91 Sets photographs showing women in various poses; 4 Bondage Promenade — ■ Vol. 1; 4 Bondage Promenade — Vol. 2; 1 Bound — #1; 1 Bound — #2; 1 Bound— #3) 1 Bound — ■ #4; 1 Bound — #5; 1 Bound— #6; 1 Bound— #7", 1 Bound— #8; 3 Bound— #9; 1 Trial by Bondage; 1 Training Camp; 1 Bondage Syndicate; 1 Bondage Honeymoon; 1 Servant Problems; 1 Vacation at Paradise Lake; 1 Subdued at Dude Ranch; 1 Bondage Promenade — Vol. 3; 4 Wrestling— Annual No. 1; 4 Bondage Contest; 4 Bound & Transformed; 2 Spanking Sisters; 3 Spanking Sisters — Annual No. 1; 4 Bondage — Annual No. 1; 4 Vixen’s Vendetta; 4 The Captive; 1 Have Leather — Will Fashion; 4 Dangerous Secret — 'EP 1; 203 Photosets; Candid Reader, No. 4; Click, Vol. 1, No. 2; Click, Vol. 1, No. 3; Gypsy, Vol. 1, No. 1; High Heels Issue 1; High Heels, Vol. 2, No. 2; Jade, Vol, 1, No. 3; La Femme, Vol. 1, No. 1; Leg Show — Collection Edition; Leg Show, Vol. 1, No. 2; Manhood, No. 1; Midnight, Vol. 2, No. 2; Naughty Nylons, Vol, 1, No. I; Nymph, No. 3; Saucy, Vol. 1, No. 3; Torehy, No. 1; Tonight, Vol. 2, No, 3; Twilight, No. 1; Tip Top, Vol. 2, No. 3. Small Girlie Booklets titled: Treasure Box — ■ Series Nos. 1-9,11,13,16 and 18. Small Booklets titled: Exotique — Series Nos. 1-12, 14-16, 18, 20-26, 28, 31-33 and 36. Small Booklets titled: Garter Parades — Series Nos, 9-10, 14, 26-28, 30. Satin and Silk, Nos. 1 and 3. Photo Button — Series Nos. 1-4, Black Nylons, Vol. 2, No. 5.
*951 are of an indecent character which is obscene, lewd, lascivious, filthy, indecent, disgusting, sadistic or masochistic and each constitutes hard-core pornography.
Some comment should be made herein concerning this last finding. The court as the trier of the facts has carefully examined each of the nearly 300 exhibits. Those consisting of magazines, books or booklets have each been considered separately in order to determine whether the ‘‘ dominant theme of the material taken as a whole appeals to the prurient interest ’ ’ (Roth v. United States, 354 U. S. 476, 489) and whether each publication “ is deliberately designed to stimulate sex feelings and to act as an aphrodisiac,” and whether “from its whole tenor the author’s intention is evident of teaching the reader about sins of impurity and arousing him to libidinousness ”. (Quotes cited with approval, Chief Judge Desmond concurring, People v. Richmond County News, 9 N Y 2d 578, 588, 589.) The court has tested each to determine whether “It focuses predominantly upon what is sexually morbid, grossly perverse and bizarre, without any artistic or scientific purpose or justification. Recognizable ‘ by the insult it offers, invariably, to sex and to the human spirit ’ * * * it is to be differentiated from the bawdy and the ribald. Depicting dirt for dirt’s sake, the obscene is the vile, rather than the coarse, the blow to sense, not merely to sensibility. It smacks, at times, of fantasy and unreality, of sexual perversion and sickness and represents, according to one thoughtful scholar, ‘ a debauchery of the sexual faculty.’” (Fuld, J., in People v. Richmond News, supra, p. 587.)
It is not for this court or any other court to determine by its own sensibilities the dominant theme of the material before it. As pointed out by Chief Judge Desmond in People v. Richmond News (p. 589) above, and citing Roth v. United States (354 U. S. 476, supra): ” And who is to decide what is the dominant theme of a particular book or picture or play? The Supreme Court has given us a sufficient answer: ‘ the average person, applying contemporary community standards.’”. The court, however, cannot escape its responsibility for as Chief Judge Desmond writing in his concurring opinion (ibid.) directed (p. 589): “The inquiry for the court, therefore, is whether the publication is so entirely obscene as to amount to ‘ hard-core pornography.’ ”
It seems by the above that while the responsibility for the determination is on the court, it must find and seek out the mind, the spirit and the sensibility of the average person in the community and then the court must determine the contemporary *952 community standard and finally by a complete metamorphosis eradicate its own mind, spirit and sensibilities and permit the mind, spirit and sensibility of the average person to inhabit its being. Who is the average person in this community? In this great community of the Niagara Frontier there are a million and one-half persons, most of whom are hard-working, church-going, God-loving, raising their families, teaching their children to live decent law-abiding lives, practicing the tenets of God and nature in their sex relations with their own spouses. Surely the average person in this community is to be found among these. To hold otherwise is to find that the average person in this community is to be found among that small group of mentally ill persons who revel in obscenity, lewdness, lasciviousness, filth, indecency, sadism and masochism. After a reasonably long lifetime spent entirely in this community, this court finds that the average person in this community is a member of the first above group.
This court with nearly a quarter of a century spent serving this community on the Bench has been an active observer of the mores of this community and is no stranger to either the good or the evil thereof.
What are the contemporary standards of this community? The answer is clear. The standards of this community at this time are those practiced by the first-above group. Certainly not those indulged in by the unfortunate minority represented by the second-above group. To hold otherwise would be to hold that the standards of this community exceed only slightly those of the ancient Cities of Sodom and Gomorrah.
Let this average citizen now apply the contemporary standards of this community to the material received in evidence by this court in order to determine the dominant theme thereof.
A large part are the so-called ‘ ‘ girlie ’ ’ magazines. These consist almost entirely of nude or semi-nude females standing up, lying down, kneeling, stooping, bending, in bed, out of bed, front view, side view, rear view, top view and bottom view. Almost without exception, each by her facial expression and bodily contortion, dramatizes an invitation to sexual experience.
Another group of material known in the trade as “ Bondage Books ” depict nude or semi-nude females voluntarily bound and tethered by ropes, chains and other shackling devices, in some instances with gagging devices in their mouths, dog collars around their necks and tourniquets around their limbs, sometimes bound singly and in some instances bound together in groups of two or more. Usually the pictures depict one female harassing another with whips, lashes and other striking devices *953 while bound. The reading material contained in these books gives a thinly veiled running description of the sexual satisfaction received from this erotic practice.
Then there is a group of booklets referred to in the list under various combinations of the words “ spanking ” or “ spanked ”. Again nude or semi-nude females, usually in pairs, are being spanked, one by the other on the buttocks, in a wide variety of postures.
Further, there is a group of booklets which, by pictures, sketches and written material, give an expose of sexual satisfaction derived from contact of the human flesh with various materials such as leather, velvet and silk, and also there are a number of booklets portraying by pictures and writings the sexual appetites of lesbians and homosexuals.
Finally, there are nearly 300 sets, 3 pictures to the set, wallet-sized, of black and white photographs of nude or semi-nude women bound, gagged, hitting, spanking, kicking and otherwise physically abusing each other in a form of sexual perversion.
These are the exhibits to be weighed by the average person applying contemparary community standards to determine whether the dominant theme of each item of the material taken as a whole appeals to the prurient interest, whether they are deliberately designed to stimulate sex feelings and act as an aphrodisiac, whether the whole tenor of the author’s intentions is evident of teaching the reader about sins of impurity and arousing him to libidinousness, whether they focus predominantly upon what is sexually morbid, grossly perverse and bizarre without any artistic or scientific purpose or justification; recognizable by the insult it offers invariably to sex and the human spirit, whether it depicits dirt for dirt’s sake, whether it smacks at times of fantasy or unreality, of sexual perversion and sickness and represents a debauchery of the sexual faculty.
There can be no doubt that the average person of this community, applying contemporary community standards, would find that the dominant theme of each of these exhibits is hardcore pornography. As above, this court has so found.
On the trial level, this decision and judgment to follow terminates this matter. This court, however, is alarmed and deeply concerned that the courts may have, in a laudatory effort to protect the freedom of the press guaranteed in the First Amendment to the United States Constitution, unwittingly set up a judicial censorship without recourse. Upon what ground lies an appeal from the judgment of the trial court? Does the trial court err when it selects the average person? Does the trial court err when it determines the contemporary community *954 standard? If so, is its error contrary to the facts or the law or both? Is an appellate court better suited to select the average person or determine the contemporary community standard than the trial court which is ordinarily a part of the community and most likely to know its average person and the contemporary standards of that community? Is a higher appellate court better suited than a lower appellate court to determine these matters ? Are three members, four members, or five members of an appellate court better suited to determine these matters than their two, three or four associates ? If no appeal can properly lie from these determinations of the trial court, has the trial court become the sole arbiter of obscenity in his community? If an appeal does lie, upon what grounds?
In determining obscenity, have the courts abdicated to the average person? Will the standards of a community remain fixed or do the words ‘ ‘ contemporary community standards ” forecast higher or lower standards in the future ? Are the sanctions of the obscenity statutes to rest on the shifting sands of time and the judicial selection of the average person? Does section 1141 of the Penal Law prescribe a crime in one community of the State but not in another? If so, criminality as far as obscenity is concerned is dependent on where the act occurs within the State as judged by the contemporary community standards of that place. These questions trouble this court.
Upon all the above, the motion for judgment by the plaintiff is granted and the motion for judgment by the defendants is denied.
The judgment to follow will enjoin the defendants as provided for in section 22-a of the Code of Criminal Procedure, and further provide for the destruction of the contraband material as provided for in subdivision 3 of the same section.