UNITED STATES of America,
Plaintiff-Appellee,

v.

WEST COAST NEWS COMPANY, Inc., a California Corporation, Wallace De-Ortega Maxey, and Sanford E. Aday, Defendants-Appellants.

Nos. 15792–15795.

United States Court of Appeals
Sixth Circuit.

March 22, 1966.

Stanley Fleishman, Hollywood, Cal., for appellants; Vander Veen, Freihofer & Cook, George R. Cook, Grand Rapids, Mich., on the brief.

Melvin L. Wulf, New York City, Legal Director, Rolland R. O'Hare, Detroit, Mich., Chairman, Erwin B. Ellmann, Detroit, Mich., Gen. Counsel, John A. Fillion, Detroit, Mich., of counsel, on brief as amici curiae for American Civil Liberties Union and American Civil Liberties Union of Michigan.

Marshall Tamor Golding, Atty., Dept. of Justice, Washington, D. C., for appellee, Herbert J. Miller, Jr., Asst. Atty. Gen., Beatrice Rosenberg, Atty., Dept. of Justice, Washington, D. C., Robert G. Quinn, Jr., U. S. Atty., Grand Rapids, Mich., on the brief.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and CECIL, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

This is an appeal from a judgment entered upon a jury verdict convicting defendants-appellants, West Coast News Company, a California Corporation, and Wallace DeOrtega Maxey and Sanford E. Aday, California residents, of violations of Sections 1461 and 1462, Title 18, U.S. C.A. The charged offenses arose from the delivery into Michigan by mail and common carrier of allegedly obscene books, including one entitled Sex Life of a Cop.[1] Trial was in the United States District Court for the Western District of Michigan. Substantial fines were imposed upon the corporate and individual defendants and the latter received severe prison sentences.

■ Our task is lightened by our view that the challenged book is by any standard obscene. It was inevitable that in today's bold and flourishing business of pornography there would come along a writing so bad that no amount of sophisticated dialectics could absolve it from classification as "hard core". Such is the book we deal with. Thus we are spared the burden of attempting our own contribution to the already abundant literature on what is and what is not obscene. Although it was the jury's function to make the final decision as to whether crimes were committed by the commerce in this book, we are put to an initial and independent judgment because of appellants' contention that, as a matter of law, the book is not obscene.

■ We are properly charged with such responsibility by Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), where the United States Supreme Court by footnote reference (p. 188, 84 S.Ct. p. 1678) finds relevant one author's observation that,

"This obligation—to reach an independent judgment * * * appears fully applicable to findings of obscenity by juries, trial courts, and administrative agencies. The Supreme Court is subject to that obligation, *as is every court before which the constitutional issue is raised.*" (Emphasis supplied)

In making this judgment, we apply the test announced by Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957) and conclude that "to the average person, applying contemporary community standards, the dominant theme of the material [the book Sex Life of a Cop] taken as a whole appeals to prurient interest."

We will not attempt illumination by extensive recital of the book's contents. This short description will suffice. Sex Life of a Cop is a paperback with a cover picturing a woman (the wife of the Mayor of the town) trying unsuccessfully to hide her nakedness behind the grotesque, underwear-clad figure of the town's Chief of Police, both of them having been interrupted in their lovers' lane dalliance by two of the town's police of-

1. The indictment charged that eight books in the shipments were obscene, but the jury disagreed as to all but *Sex Life of a Cop.*

ficers. The latter pair are the heroes of the narrative. Their discovery of the Chief and his lady was not the product of zeal to enforce the law, but of their effort to beguile the monotony of their round of duty by such surprise intrusions.

Inside the covers are pages which the defendants' experts call "blurbs". These are short, but meaty, excerpts from other books available from the publishers, and give prurient promise of the books' contents. They demonstrate that the publisher, at least, suffered from no illusions as to the interests to which the book was directed. One of the blurbs, however, has an intellectual flavor. It identifies as an author, Wallace DeOrtega Maxey, Doctor of Divinity, whom we assume to be the defendant of the same name. "Dr. Maxey" is described as a minister who has cast off the shackles of prudery, (now an evangelist for freedom) whose "views are in sharp contrast with those of most other ministers, but so were the views of Columbus with those of the other navigators of his time. The new idea replaces the old; the world is not flat."

The 147 pages of the alleged novel are generously faithful to the promise of the blurbs. Without palliating interruption, the story moves quickly from one sexual enterprise to another. So numerous are these events that even the practiced skill of the author runs out of fresh imagery and dully repeats his supply of leering adjectives. The chief actors are a police sergeant and his fellow occupant of the appropriately named "prowl car". These officers, except for some needed rest from their amours, devote most of their on-duty and off-duty hours to successful sex encounters with whatever females come within their view. Their conquests range from a virgin to a "100 dollar" prostitute. The wives of the Chief of Police and the Mayor of the town, the new female police dispatcher, friendly waitresses, two nurses who promptly take off their clothes when the busy officers, otherwise unheralded, climb through their open window, a drunken "society" lady who is first rescued from a corner lamppost and then raped in the back seat of the prowl car, and a miscellany of other willing ladies, make up the cast. Every female identified in the story is easy prey for the officers. With their husbands away, some married ladies gain the officers' sexual services by false night calls to the police dispatcher complaining of a "prowler." Chivalrous response by the prowl car is rewarded by amorous receptions. Even the wife of his fellow officer is not overlooked by Sergeant Thorne. The drama concludes with a smashing *denouement* when the sergeant discovers, as an eyewitness, that his own beloved Alice has been enjoying his outranked, prowl-car-pal's offerings. The moral lesson of retribution, which defendants' experts claim gives this book a social value, subtly emerges in the cuckolded sergeant's plaintive soliloquy "What in the world have I ever done to deserve this?" Thus ends the play.

We cannot believe that the First Amendment's great guarantee of freedom of expression can be elasticized to embrace Sex Life of a Cop. We conclude this part of our opinion with imitation of the wise and timesaving succinctness employed by Mr. Justice Potter Stewart in *Jacobellis*. Avoiding agonizing dissertation on the subject of obscenity, he said "I know it when I see it, and the motion picture involved in this case is not that." May we then, exercising the common sense which we like to think is a mark of today's federal judges, say that we know hard core pornography when we see it, and Sex Life of a Cop is just that. This initial and required judgment on the matter will be our ruling that the United States Constitution was not offended by letting this case go to the jury.

We will discuss such of the other charged errors as we consider merit consideration. Many of these were discussed adequately and at length in opinions of the District Judge, published as United States v. West Coast News Company, 216 F.Supp. 911 (W.D.Mich.1963) and United States v. West Coast News Company, 228 F.Supp. 171 (W.D.Mich.1964).

These opinions bring together various rulings made during the course of and after trial. In the main, they are dispositive of the questions before us.

1. Rulings on defendants' expert testimony.

■ At pretrial, the subject of expert witnesses was discussed. The District Judge announced that he would allow each side to use two. Appellants' counsel requested the use of four. The judge allowed him three. Defendants were to make the selection of which three of their four witnesses they would use. We think the limitation on the use of experts was within the trial judge's discretion. See Annot. 5 A.L.R.3d 238, 257 § 11. We do not consider that he abused it. See his discussion at 228 F.Supp. 182–191.

■ The District Judge refused to allow appellants' experts to give their opinion as to whether Sex Life of a Cop was obscene. Such was the ultimate issue for the jury's determination. We find no error in this regard. While we have not been cited to any decision squarely on this point, we consider our view supported by respectable authority. United States v. Levine, 83 F.2d 156, 157 (CA 2, 1936); Volanski v. United States, 246 F.2d 842, 844 (CA 6, 1957); Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204, 206 (1961), cert. den. 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822; Kahm v. United States, 300 F.2d 78, 84 (CA 5, 1962) cert. den. 369 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18; Commonwealth v. Isenstadt, 318 Mass. 543, 62 N.E.2d 840 (1945). And see the District Judge's discussion at 228 F.Supp. 182–191.

Defendants' experts were allowed to express their opinions as to the literary value and social importance of Sex Life of a Cop, as well as their views as to its acceptability by "contemporary community standards." The experts were Robert J. Kirsch, literary editor of the Los Angeles Times and part time teacher of "creative writing" at the University of California, Edward L. Galligan, professor of English at Western Michigan University, and one Guy Endore, an author who has lectured at various universities.[2] Among other observations, the witness Kirsch gave the book literary standing as a novel because "it has what I would consider to be the minimal qualities of a novel, it has prose composition that relates incidents in a narrative scenic form, *it has a beginning, middle and an end.*" (Emphasis supplied.) In his view, contemporary community standards will put up with the use of language "of every kind and level" and today's accepted literature treats "in very explicit detail" with "abnormality and perversity of all the convolutions of sexual activity." Professor Galligan buttressed his assertion that Sex Life of a Cop did not offend contemporary community standards with the profound observation that "the writer wouldn't write about it [sex] unless there is an audience willing to read about it." Exhibiting his expertness, he said that, vis-à-vis today's sex literature, Sex Life of a Cop loses standing because its sexual scenes are "not vivid enough." As to the book's literary value, he described it as "a novel of social realism and social criticism, written in the tradition of the picaresque novel" and added that *"for the sort of book that it is,* for its audience, and *for what it is trying to do,* I think it has some real value." (Emphasis supplied.) The author-witness Endore found literary validity in Sex Life of a Cop in its exposure of "the methods of the police in this little town" and "the sexual life of the cops." He felt that "anything in the life of people is valid material for a novel." These experts had the view that our national community standards had so deteriorated, or "matured," that Sex Life of a Cop did not offend. Social importance was found in the retribution that was visited upon

2. Defendants' fourth expert, excluded under the ruling limiting the number of experts, was Dr. Martha Boaz, Dean of the School of Library Science of the University of Southern California. The offer of her proof asserted that she was prepared to testify that there was nothing in *Sex Life of a Cop* and its accused companions "that would cause her to hesitate to submit them to students to read."

the sergeant by his own wife's infidelity and in the corruption and immorality of all of the actors, police and municipal officials, their wives and every female encountered by the heroes. It is indeed frightening to be aware that traffickers in such a book as we deal with can call to their defense the schoolmen and others with the intellectual eminence claimed by these experts. Were it not for that, we might wonder whether these distinguished experts were not really spoofing us with their elegant esoterica. We may assume, however, that their testimony was expressive of sincere intellectual conviction. We cannot, however, fault the jury for finding unconvincing these experts' rationalization of the social worth and literary importance of Sex Life of a Cop.

◾ A further error charged was the trial judge's refusal to allow defendants' experts either to identify to the jury various books claimed comparable to Sex Life of a Cop and which had been found by the United States Supreme Court or other courts not obscene, or to identify other books allegedly accepted by contemporary community standards. To avoid intolerable flooding of the record the District Judge, correctly in our view, advised appellants' counsel to select a limit of eight books for such use. He admonished that these books could be so used only if it were proven that they were in fact comparable to the books covered by the indictment, and had in fact become acceptable by contemporary community standards. Defense counsel thereupon chose the following eight books: Fanny Hill, Tropic of Capricorn, Lady Chatterly's Lover, Naked Lunch, Carpetbaggers, Cold Wind in August, Clip Joint Cutie and Sin Binge.

◾ To test the comparability of the first six books, a preliminary voir dire of defendants' experts was conducted out of the presence of the jury. From his evaluation of the experts' characterization of the literary quality of these books and from his reading of them, the District Judge concluded that they were so dissimilar to Sex Life of a Cop and its companions as to render them irrelevant and, hence, inadmissible. From our review of the record, we are satisfied that such ruling was correct. See Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204, 206 (1961), cert. den. 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822, and Judge Fox's ample discussion of the point at 228 F. Supp. 191–201.

◾ The government conceded that Sin Binge and Clip Joint Cutie were similar to the challenged books. They were denied admission, however, for lack of proof that they had become acceptable by community standards. We consider such ruling correct, as was the trial judge's refusal to admit a flood of other material solely on the claim that books of the same general trend, embellished with like "blurbs," could be found on the shelves of many book stores and news racks. See People v. Finkelstein, 11 N.Y. 2d 300, 229 N.Y.S.2d 367, 183 N.E.2d 661, cert. den. 371 U.S. 863, 83 S.Ct. 116, 9 L.Ed.2d 100 (1962). We are not persuaded that the establishment of a fait accompli by the purveyors of pornography is proof that they have already succeeded in destroying every remaining standard of our contemporary society. Nor has that society endowed these men with the right to establish our standards. License to continue does not follow each victory in spreading obscenity.[3] See United States v. Oakley, 290 F.2d 517, 519 (CA 6, 1961), cert. den. 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 87, rehearing den. 368 U.S. 936, 82 S.Ct. 358, 7 L.Ed.2d 198.

In approving the rulings of the District Judge on appellants' use of expert testi-

---

3. The proportions of these victories for pornography are illustrated by defendants' chief counsel's offer to put in evidence a miscellany of books which are "illustrative of literally thousands of like books which have been put on the market over the last three or four years; that these books have covers and blurbs which are sexually far more candid than any of the covers or blurbs involved in the case herein; that all of these books are distributed nationally, that is to say virtually in every state in the Union."

mony, we are not unmindful of the relevant observations of Justices Frankfurter and Harlan in their concurring opinions in Smith v. People of State of California, 361 U.S. 147, 164, 165, 172, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). We do not content ourselves by saying that those concurrences did not necessarily express the majority view, but are agreed that what the District Judge did in this case does not offend the views of those distinguished Justices. We consider that their suggestions of a legitimate range of admissible expert testimony were satisfied by what the experts here were allowed to tell the jury.

### 2. Motion for Change of Venue.

 Appellants moved, under Rule 21, Fed.R.Crim.P., to transfer the involved proceedings to California. The charged offenses encompassed the transportation of the allegedly obscene material from Fresno, California, appellants' base of operations, into four cities in Michigan, 18 U.S.C.A. §§ 1461, 1462. They complained of the hardships involved in standing trial so far from their homes, with the attendant expense of bringing witnesses and counsel to present their defense. The individual defendants averred that in California they had witnesses "who could testify to their reputation for truth and good moral character." [4] The motion was initially heard and denied by District Judge Raymond Starr whose opinion is reported as United States v. West Coast News Company, 30 F.R.D. 13, (W.D.Mich.1962). We consider Judge Starr's opinion a quite adequate exposition of the rule that the involved motion was addressed to the discretion of the District Judge and a clear demonstration that his discretion was soundly exercised. It will appear that

Judge Starr expressed a view that the "community standards" of Roth would in this case be those of jurors from the Michigan community. His opinion came down February 13, 1962, before Manual Enterprises v. Day, 370 U.S. 478, 488, 82 S.Ct. 1432, 8 L.Ed.2d 639 on June 25, 1962, and Jacobellis v. State of Ohio, 378 U.S. 184, 193, 194, 195, 84 S.Ct. 1676, 12 L.Ed.2d 793, on June 22, 1964, determined that the involved "community" was the entire nation. Following Manual, defendants renewed their motion for transfer of the trial to California, asserting that Manual destroyed the validity of the reasons given by Judge Starr in denying the motion. This renewed motion was also supported by new affidavits averring additional hardships in standing trial in Michigan. Judge Fox denied this second motion and this denial was not bottomed upon an erroneous view of the "community standards" that would apply. We assume that Judge Fox considered the entire thrust of appellants' motion and exercised his discretion by denying it. The indictment charged that crimes were committed in Michigan. Appellants had no constitutional right to be tried in their "home" state even though the crimes charged were committed there as well as in the State of Michigan where they chose to do business. Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). We think that upon this appellate review, the question is "were these defendants deprived of a fair trial as a result of the denial?" United States v. Aronson, 319 F.2d 48, 52 (CA 2, 1963), cert. den. 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164, rehearing den. 375 U.S. 982, 84 S.Ct. 477, 11 L.Ed.2d 428. In our view, they were not. Whatever their early fears, they were able to provide an array of expert

---

4. The government's appendix includes the following recital of the content of the presentence report before the District Judge:

"The prior record of Aday * * * included a past state conviction for pimping and pandering. The pandering count involved 'the placing of a nineteen year old married woman and a mother, the wife of a serviceman, in a house of prostitution'

and the pimping count involved taking prostitutes to labor camps where he would wait outside the bunkhouses and take the money from them as they emerged."

As to Maxey, the appendix avers that "The prior record of appellant Maxey * * * included a record of homosexuality and two arrests for soliciting and committing homosexual acts in public."

witnesses from California as well as Michigan and their defense was vigorously presented by themselves and California lawyers highly skilled in defense of obscenity cases, with the assistance of local counsel.

### 3. Presentation of the accused books to the jury.

█ The government requested that the accused books be taken and read by the jury in the jury room. The defense requested that each book be read to the jury *viva voce* in open court. The District Judge ruled that the books be read individually by the jurors in open court with the judge, a court reporter and all counsel present. We find no fault with the plan adopted. The District Judge's reasons for such discretionary choice are adequately and well articulated in his opinion at 228 F.Supp. 175–179.

### 4. The District Judge's instructions.

█ A specific criticism was the District Judge's refusal to tell the jury that in addition to proving that defendants knew the contents of the accused books, it was the government's burden to prove that the individual defendants also knew that such contents were in fact obscene. The Court refused to charge that: "If you believe that defendants were honestly ignorant of the 'obscenity' of the books, if you should find they were obscene, then the defendants should be acquitted." The Court did tell the jury:

"Therefore, before you may convict, in addition to finding a book is obscene, you must find * * * as to each defendant that he knew the contents of the book and knowingly caused it to be mailed or so carried here."

and, further, that:

"If a defendant was honestly mistaken as to the contents of any book or books, or if he had no knowledge of the contents of any book or books, or if you have a reasonable doubt as to such defendant's knowledge of the contents of any book or books, then as to such defendant * * * you must find the defendant not guilty."

In the context of this case and our above expressed view of the obvious obscenity of Sex Life of a Cop, we find no reversible error in the Court's refusal of the proffered request. Rosen v. United States, 161 U.S. 29, 41–42, 16 S.Ct. 434, 40 L.Ed. 606 (1896); Kahm v. United States, 300 F.2d 78, 86 (CA 5, 1962), cert. den. 369 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18; United States v. Oakley, 290 F.2d 517, 519 (CA 6, 1961), cert. den. 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 87, rehearing den. 368 U.S. 936, 82 S.Ct. 358, 7 L.Ed.2d 198. In *Rosen,* the Supreme Court said:

"Every one who uses the mails of the United States for carrying papers or publications must take notice of what, in this enlightened age, is meant by decency, purity, and chastity in social life, and what must be deemed obscene, lewd, and lascivious." 161 U.S. at page 42, 16 S.Ct. at page 438.

and the Court was thereby finding without error refusal to give a request substantially the same as the one here refused. Notwithstanding the expanding liberality that has followed *Rosen* the above quote was appended without criticism as footnote 28 to Roth v. United States, 354 U.S. 476, 491, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

█ Appellants make numerous other charges of error in the instructions that the District Judge did give and in his refusal of others proffered by appellants. Appellants' counsel initially submitted ninety-nine requests to charge and at the end of the trial submitted twenty-nine more. Such inundation of a trial judge, with the obvious hope that the created confusion will lead him to error, is questionable practice. United States v. Olweiss, 138 F.2d 798, 800 (CA 2, 1943); Bateman v. United States, 212 F.2d 61, 69 (CA 9, 1954).

We will not attempt detailed discussion of the District Judge's charge to the jury. Suffice it to say that his instructions followed the guidelines of *Roth* and *Jacobellis* and adequately presented the applicable rules of law. We find in it no errors

or insufficiencies that adversely affected any substantial rights of the appellants. Fed.R.Crim.P. Rule 52.

### 5. Challenge to Grand Jury array.

■ Defendants were arraigned on March 2, 1962, and pleaded not guilty. On March 27, 1962, they moved to dismiss the indictment on the ground that the grand jury which had returned the indictment had been improperly composed. Such motion came a year and ten months after the indictment had been returned. Between then and the arraignment, extensive procedural steps had been taken by defendants. The District Judge conducted a hearing at which defendants presented evidence in support of the motion. He denied it on two grounds: first, that the motion was untimely and the objection had been waived and, second, that it was unmeritorious. His opinion on the matter is set out at 216 F.Supp. 911, 914–921 (D.C.W.D.Mich., 1963).

We consider that the District Judge correctly ruled that defendants' delay was, in the absence of excuse or explanation, sufficient to render the motion untimely. In Scales v. United States, 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L.Ed.2d 782, the Supreme Court affirmed the holding of the Fourth Circuit which, in Scales v. United States, 260 F.2d 21, 46 (1958) had said, with reference to a ruling substantially like the one here,

> "This ruling was entirely justified under the terms of Rule 12 [F.R.Crim. P.], as interpreted by the authorities. The information on which the motion was based was at all times available to the defendant and yet he failed to take action despite liberal extensions of time."

The Fourth Circuit there cited Agnew v. United States, 165 U.S. 36, 44, 17 S.Ct. 235, 41 L.Ed. 624 (1897), to support its ruling, as did the District Judge here.

■ The denial of the motion on its merits was also without fault. We need not detail what the evidence disclosed as to the method employed by the Western District of Michigan in obtaining names for jury service, other than to mention that the "Suggester" or "Key Man" system was used. No prejudice to defendants, or constitutional deprivation was disclosed by the evidence. See United States v. Hoffa, 349 F.2d 20, 29–30 (CA 6, 1965).

### 6. Constitutionality of amended statutes.

■ Appellants contend that 1958 amendments to §§ 1461, 1462 which permit prosecution at the place of delivery as well as at the point of origin are unconstitutional. The writer expressed a contrary view in United States v. Frew, 187 F.Supp. 500, 507 (E.D.Mich.1960). We find no constitutional fault in the statutes as amended. Appellants further suggest that in view of the decisions that have followed *Roth* and because of the replacement of some of the Justices who made up the majority in that case, *Roth* is of doubtful value as a precedent. Indeed, the American Civil Liberties Union, in its amicus brief, intimates that we should now narrow the restrictions announced by *Roth*. ACLU says:

> "The teaching of *Roth* that material loses the protection of the Constitution if it can be called 'obscene' has bred more confusion than it has allayed."

and adds that the difficulty of obtaining an "authoritative consensus" from the Supreme Court in the cases that have followed *Roth* underlines, in the view of the ACLU, "the bankruptcy and inadequacy of the formulation in *Roth*."

We read all of this to mean that the time has now come to remove whatever restraints are still available to the government to impede the progress of the business we deal with. We have neither the right nor the inclination to seek a way around *Roth*.

### 7. Other matters.

We have considered other contentions of appellants and find them without merit.

### 8. The sentences.

Defendants, Aday, Maxey and West Coast News Company, Inc., were each found guilty under Counts 6, 10, 12, 13 and 14 of the indictment. The charge in

Count 6 was the use of the *mails* to effect the carriage and delivery of copies of Sex Life of a Cop from Fresno, California, to Battle Creek, Michigan, on or about August 24, 1959, in violation of 18 U.S.C.A. § 1461. Counts 10, 12, 13 and 14 involved the use of a *common carrier* to effect like transportation to the Michigan cities of Kalamazoo, Grand Rapids, Kalamazoo and Muskegon on the respective dates of September 30, August 4, August 6, and August 4, 1959, all in violation of 18 U.S.C.A. § 1462. These statutes permit imposition of a prison sentence of not more than five years and of a fine of not more than $5,000. Defendant Aday received the maximum under each count, five years imprisonment and a $5,000 fine, cumulated to a total of 25 years imprisonment and a fine of $25,000. Defendant Maxey received a prison sentence of five years on each of counts 6 and 10, two years on each of counts 12 and 13, and 1 year on count 14, cumulated to 15 years; he was fined $5,000 on each of counts 6 and 10, $2,000 on each of counts 12 and 13 and $5,000 on count 14, cumulated to a total of $19,000. The Corporation received the maximum fine of $5,000 on each of the five counts, cumulated to a total of $25,000. The prison sentences on Aday and Maxey were made subject to 18 U.S.C.A. § 4208 (a) (2), with the specification that the prisoners would "become eligible for parole at such time as the board of parole may determine."

Appellants charge that because of their proximity in time and place the shipments constituted but one offense; that if the statutes can be construed to permit the consecutive sentences imposed here, such statutes and the sentences offend the United States Constitution's Eighth Amendment proscription of cruel and inhuman punishment.

We do not agree with the contention that the several shipments which violated § 1462 constituted but one offense. We do, however, express our view that less severe sentences would have been a more discreet exercise of the District Judge's authority. In Beckett v. United States, 84 F.2d 731, 732, 733 (CA 6, 1936) we adhered to the rule that appellate courts are generally "powerless to intervene" to change a District Judge's choice of sentence. Judge Simons there said "the discretion conferred by them [the statutes there involved] in respect to sentence is one vested in the sentencing judge and not in a reviewing court." He also considered that it was not illegal to impose consecutive sentences for offenses which might be viewed as components of a course of conduct, but of such practice he said, "caution and moderation must needs rule its exercise." We have adhered to the rule of Beckett in our later holdings. Livers v. United States, 185 F.2d 807 (CA 6, 1950); Costner v. United States, 271 F.2d 261 (CA 6, 1959); United States v. McGuire, 328 F. 2d 303 (CA 6, 1964); United States v. Gargano, 338 F.2d 893, (CA 6, 1964). We have, as is true of other courts, often taken occasion to say that the discretion which we held belonged to the sentencing judge had not, in the case then before us, been abused.

In Yates v. United States, 356 U.S. 363, 367, 78 S.Ct. 766, 2 L.Ed.2d 837 (1958) and in United States v. United Mine Workers, 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Supreme Court reduced in the one a prison sentence, and in the other a fine. Both of these, however, involved punishment for criminal contempt. In Brown v. United States, 359 U.S. 41, 52, 79 S.Ct. 539, 547, 3 L.Ed.2d 609 (1959) the Court indicated that the power there exercised was peculiar to contempt cases, saying,

"Because there is no statutory limit upon a District Court's sentencing power in cases of criminal contempt, Green v. United States, 356 U.S. 165 [78 S.Ct. 632, 2 L.Ed.2d 672], this Court is not without power to review its exercise." Cf. Yates v. United States, 356 U.S. 363, 365, 78 S.Ct. 766, 2 L.Ed.2d 837; Nilva v. United States, 352 U.S. 385, 386, 77 S.Ct. 431, 1 L.Ed. 2d 415.

In its first remand of Yates, the Supreme Court expressed its view of the

necessity "of having the trial judge reconsider the sentence *in the cool reflection of subsequent events.*" (Emphasis supplied.) Yates v. United States, 355 U.S. 66, 76, 78 S.Ct. 128, 134, 2 L.Ed.2d 95 (1957). Perhaps the District Judge here may accept as a relevant "subsequent event" the thoughts we now express. The Seventh Circuit in its two decisions of United States v. Wiley, 267 F.2d 453 (1959) and United States v. Wiley, 278 F.2d 500 (1960), twice vacated an imposed prison sentence primarily because of its disapproval of a District Court practice of refusing to consider probation for an accused who stood trial rather than plead guilty. These cases can be read as holding that we have the power to set aside or reduce the severity of a sentence as an exercise of a federal appellate court's "supervisory power over the administration of justice in the lower federal courts." Yates v. United States, 356 U.S. 363, 366, 367, 78 S.Ct. 766, 768, 769. A distinguished member of the Tenth Circuit, albeit as a dissenter, would read the broad language of 28 U.S.C.A. Section 2106 as giving appellate courts the right to modify, by reduction, a District Court sentence. Smith v. United States, 273 F. 2d 462, 468, 469 (CA 10, 1959). We have in mind, also, that all doubts as to appellate power in this regard may be shortly resolved if the Congress adopts presently proposed legislation which would provide federal appellate courts clear and broad powers in this field.

We applaud and share the desire of the learned District Judge in this case to strike at and slow down the ever-increasing velocity of today's commerce in obscenity. The characters of defendants Aday and Maxey as shown by their earlier criminal conduct give little support to a plea for moderation. It may indeed be that each of them has already "exhausted his balance with fate." On the other hand, while we think that the mailing which violated Section 1461 calls for separate punishment, we are unable to avoid looking upon the offenses which violated Section 1462 as so similar in time and place that they would be adequately punished if the five year or lesser terms under these counts be made to run concurrently, but consecutive to the five year sentence under the Section 1461 count. Thus, neither defendant could receive any greater prison sentence than 10 years. We think, too, that it would be appropriate for the District Judge to continue his disparate treatment of the defendants by reducing the Maxey sentence under § 1462 to something less than that imposed upon Aday. We are not unmindful that 18 U.S.C.A. § 4208(a) (2) would permit the parole authorities to shorten the time to be served under any sentence, but believe that the courts should, by their initial choice, fix its limits. We suggest no change in the fines imposed. It is a fair inference that the big business we deal with can well afford them.

Upon a mandate going down on the affirmance of the conviction of these defendants, it will be within the power of the District Judge under Rule 35 of the Federal Rules of Criminal Procedure to reduce the prison sentences imposed. He can do this *sua sponte* without command from us or motion by defendants. Because of this, we need not now announce whether we consider that the District Judge abused his discretion in imposing the involved sentences, whether we consider that today's law permits us to change such sentences, or whether we consider that the sentences imposed by the District Judge offend the Eighth Amendment proscription of cruel and inhuman punishment. There will be time enough for us to further consider the matter should the District Judge conclude not to adopt our suggestion as to reduction of the sentences.

This may indeed be a pragmatic handling of these difficult questions, and with great respect for the District Judge's earlier views, we hope that he will find it discreet to follow our thoughts, born of more opportunity for reflection than was available to him. This litigation has long pended and should be terminated.

We affirm the judgment of conviction and remand the cause to the District Court for its reconsideration of the prison sentences in the light of this opinion.