386 F.2d 74
 Francis POTWORA and Imperial News Company, Inc., Plaintiffs-Appellants,
v.
Michael F. DILLON, Individually and in his capacity as
District Attorney of Erie County, Buffalo, New York, Frank
Felicetta, Individually and in his capacity as Commissioner
of Police of the City of Buffalo, New York, Louis Wenzka,
Individually and in his capacity as Chief of Police, Village
of Depew Police Department, Frank Spano, Individually and in
his capacity as Head of the Salacious Literature Squad of
the Buffalo Police Department, and John Maccarone,
Individually and as a Member of the Depew Police Department,
Defendants-Respondents.
 No. 164, Docket 31748.
 United States Court of Appeals Second Circuit.
 Argued Oct. 27, 1967.
Decided Nov. 15, 1967.
 
 Harold Price Fahringer, Lipsitz, Green, Fahringer, Roll, Schuler & James, Buffalo, N.Y., for plaintiffs-appellants.
 Arthur G. Baumeister, Asst. Dist. Atty., Erie County, Buffalo, N.Y. (William E. Carey, Asst. Dist. Atty., of counsel on the brief), for appellee Michael F. Dillon.
 Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.
 FRIENDLY, Circuit Judge:
 This appeal is from an order of the District Court for the Western District of New York denying a mandatory injunction for the return of a quantity of books alleged to have been illegally seized. It comes to us upon a record consisting only of the complaint, an order to show cause, an answer of two defendants, and a brief opinion.
 The plaintiffs are Francis Potwora, who is the subject of a criminal charge for selling obscene books under N.Y. Penal Law, McKinney's Consol.Laws, C. 40, 1141, subd. 1 before the village justice of the Village of Depew, and Imperial News Co. The complaint was filed under the Civil Rights Act, 42 U.S.C. 1983, against the district attorney for Erie County, New York, and officers and members of the police department of the City of Buffalo and the Village of Depew.[1] It alleged that on August 28, 1967, some fifteen police officers entered the premises of Imperial in the Village of Depew and seized approximately 7000 allegedly obscene books.[2] These included ten titles-- Pleasures & Follies of a Good Natured Libertine, Sex Life of a Cop, Adam and Eve, Business as Usual, Autobiography of a Flea, The Debauched Hospodar, Dark Hunger, Memoirs of a Young Rakehill, The Gilded Lily, and Flossie. The officers were armed with a search warrant issued ex parte by a county judge which mentioned the first six titles but not the last four. Plaintiffs' counsel protested to no avail against the seizure of copies beyond the small number that would be needed for a prosecution. None of the books have been restored except for the 177 copies of Sex Life of a Cop, which the 'cops' returned when counsel called their attention to Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967), summarily reversing a decision holding the book obscene under 18 U.S.C. 1461-62; United States v. West Coast News Co., 357 F.2d 855 (6 Cir. 1966).
 The only immediate relief sought was the return of the publications seized except five copies of each; the complaint did not allege that defendants were threatening further seizures and no request was made for a temporary injunction against their making them. Nothing that state criminal proceeding were pending and that 'there is presently no reason to believe that prompt application for relief to the state courts will not provide an adequate forum for determining plaintiffs' claims,' Judge Henderson, on September 12, 1967, in the exercise of discretion, denied plaintiffs' application for an order directing return of such of the books as were not needed for the criminal trial. In light of plaintiffs' representation that the order deprived them of important First Amendment rights, we heard the appeal on an expedited basis; meanwhile, at Potwora's request, his trial before the Village Justice was adjourned.
 
 
 1
 At the argument before us the district attorney for Erie County made no effort to defend the legality of the large scale seizure without an adversary hearing-- wisely so in view of Marcus v. Search Warrant, etc., 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), and Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); cf. People v. Rothenberg, 20 N.Y.2d 35, 281 N.Y.S.2d 316, 228 N.E.2d 379 (1967). His position was rather that plaintiffs had a number of avenues of relief available in the state courts. The most promising was to move under 813-c of the New York Code of Criminal Procedure which we quote in the margin;[3] another was to proceed promptly to trial on the criminal charge.[4] Plaintiffs did not here attempt to explain their failure to seek relief from the New York courts save by stressing that they did not seek to enjoin the state criminal proceeding, expressing a preference for 'federal justice,' and relying on a statement in Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), that 'the federal remedy' under 42 U.S.C. 1983, 'is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.'
 
 
 2
 An appeal in which state officials persist in holding allegedly obscene books in defiance of applicable rulings of the Supreme Court but their distributor offers no better reason for federal injunctive relief than his preference for a federal forum does not greatly warm the cockles of the judicial heart. Nevertheless the case sharply poses the issue how far in an action under 42 U.S.C. 1983 a federal court should consider the adequacy of the remedies provided by the state when deciding whether to grant equitable relief.[5]
 
 
 3
 Plaintiffs' blanket position as to the irrelevancy of state remedies goes considerably beyond the authorities cited to support it. While the Marcus and Quantity of Books decisions demonstrate the invalidity of the seizure, these cases came to the Supreme Court from state courts and did not, and in the nature of things could not, deal with the propriety of federal injunctive relief. The quotation from Monroe v. Pape states the retionale of that decision incompletely. The Court's opinion carefully delineates the 'three main aims' that 1983 sought to serve. Id. at 173-174, 81 S.Ct. 473, 477, 5 L.Ed.2d 492. First, the statute overrode invidious state law; second, it provided a federal remedy where the state's was inadequate on its face; 'the third aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice.' The language upon which the plaintiffs rely as it thus appears in context, id. at 183, 81 S.Ct. at 482:
 
 
 4
 It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.
 
 
 5
 simply emphasizes that the federal court must be certain that a remedy that seems 'adequate in theory' will be 'available in practice'; it is not enough that the state statute will be adequate 'if enforced.' Monroe v. Pape was an action for damages and the quoted statement must be read in that light; the Court surely had no intention to abrogate in civil rights cases the historic rule, embodied long ago in 16 of the First Judiciary Act, 1 Stat. 82 (1789), and later in Rev.Stat. 723 and 28 U.S.C. 384 (1940 ed.)[6] that suits in equity shall not be sustained in courts of the United States 'in any case where a plain, adequate and complete remedy may be had at law.' See Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 76 L.Ed. 447 (1932). McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), further explicates the principles with respect to state remedies announced in Monroe. In denying a prayer for equitable relief including registration of negro students in racially integrated schools pursuant to an approved plan, the District Court, although recognizing that the state administrative remedies were cumbersome and inadequate, had 'dismissed' the complaint, saying that 'until at least an honest attempt is made to pursue that remedy, this Court should not interfere with the state authorities and deprive them of the opportunity to put their own house in order.' 199 F.Supp. 403, 407 (E.D.Ill.1961). While the Supreme Court reversed, it emphasized that the state administrative remedy was cumbersome and inadequate and did not suggest that a federal court cannot consult the traditional principles of equity, as informed by the standards announced in Monroe, when deciding whether or not to grant an injunction.
 
 
 6
 Turning to cases where injunctions have issued to protect First Amendment rights, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), held that defending a state criminal prosecution was not, on the facts of that case, an adequate means of vindicating plaintiffs' First Amendment rights, see fn. 4, and that consequently the District Court had erred in deciding there was no showing of 'irreparable injury' sufficient to merit equitable intervention. The fact that the decision was stated in terms of 'the traditional doctrines of equity,' id. at 490, at 85 S.Ct. 1123, demonstrates that the Court sought to control equitable discretion, not to abolish it. The order for the return of documents in that case, 380 U.S. at 497, at 85 S.Ct 1127, was part of a broader injunction; apparently also it was not urged that Louisiana law afforded adequate relief on that score and examination of the Louisiana statutes, Code of Criminal Procedure 42, 48, would indicate that they do not. The order in In re Louisiana News Co., 187 F.Supp. 241, 245 (E.D.La.1960), for the return of seized magazines was also part of a broader injunction restraining future violations of plaintiffs' First Amendment rights and, as just stated, there appears to have been no state remedy other than the there inadequate one of defending the criminal prosecution. Evergreen Review, Inc. v. Cahn, 230 F.Supp. 498, 504-505 (E.D.N.Y.1964), is more helpful to plaintiffs since, as examination of the briefs shows, defendant argued the availability of 813-c of the New York Code of Criminal Procedure as a basis for denying federal equitable relief. However, the opinion does not discuss the point and the order for return of the magazines was part of an injunction covering future interference. We should therefore not consider ourselves required to reverse the order denying plaintiffs' motion if we were convinced that 813-c of the New York Code of Criminal Procedure as enforced afforded a 'plain, adequate and complete remedy.'
 
 
 7
 This, however, is where appellees' argument fails. The difficulty stems from the fact that even if the motion to suppress should be granted, 813-c provides that the property shall be restored only if it is not 'otherwise subject to lawful detention,' cf. F.R.Cr.P. 41(e), but is silent as to how, when and by whom this issue is to be determined. While the section has been little construed in this respect in reported cases, such decisions as we have found convey the impression that a successful movant may still be a long way from getting his property back. Application of Pinta, 36 Misc.2d 386, 232 N.Y.S.2d 336 (Sup.Ct. Bronx County 1962), concerned $2606 in cash unlawfully seized by the police in a gambling raid. Not only had Pinta already won a 813-c motion to suppress but the criminal charge against him had been dismissed for want of evidence and the Bronx District Attorney had issued a release to the police property clerk stating in substance that the prosecutor had no further need for the money. However, the property clerk refused to hand the money over to Pinta, the magistrate who had granted the 813-c motion declined to order the clerk to do so because he was not sure that Pinta was the 'proper and legal owner' though apparently no one had appeared to make a competing claim, and the Special Term sustained him.[7] Still more apposite is Stengel v. Smith, 37 Misc.2d 947, 236 N.Y.S.2d 569 (Sup.Ct.Erie County), rev'd, 18 A.D.2d 458, 240 N.Y.S.2d 200 (App.Div. 4th Dep't 1963), where the Supreme Court's opinion, 236 N.Y.S.2d at 571, recounts the following: On December 5, 1962, police seized 79 cartons of books, magazines and pictures from defendant's book store. After criminal charges were preferred, a magistrate granted Smith's motion under 813-c to suppress the great majority of the publications that had been confiscated. Apparently, however, they were not returned, and Smith had to petition the District Court for the Western District of New York for an injunction under 42 U.S.C. 1983 ordering the Buffalo Police Department to return the material that had been suppressed. While Judge Henderson there directed the police to return the material by January 3, 1963, he granted a stay until January 11 and on January 4, Buffalo's Corporation Counsel instituted an action under 22-a of the Code of Criminal Procedure demanding that 300 items be declared obscene. Not until January 8, a month after the seizure, did the Supreme Court judge hearing this complaint order the release of everything that had been suppressed except these items. Meanwhile defendant was deprived of its right to distribute salacious books and the public of its right to read them. If other victims of massive seizures of obscene publications have found orders of suppression under 813-c to be more efficacious, the state has not brought this to our attention.
 
 
 8
 Since on the limited record before him the district judge was not warranted in finding state remedies adequate for the prompt protection of plaintiffs' First Amendment rights, we are constrained to reverse with directions to enter the injunction requested by them. Hillsborough Township, Somerset County, N.J., v. Cromwell, 326 U.S. 620, 625, 66 S.Ct. 445, 90 L.Ed. 358 (1946).
 
 
 9
 It is so ordered.
 
 
 
 [1]
 The complaint also named the apecial agent in charge of the Buffalo office of the FBI as a defendant but plaintiffs' counsel stipulated in open court that the action should be discontinued as to him
 
 
 [2]
 Plaintiffs' brief raises the number to 8024
 
 
 [3]
 813-c. The motion in general. A person claiming to be aggrieved by an unlawful search and seizure and having reasonable grounds to believe that the property, papers or things, hereinafter referred to as property, claimed to have been unlawfully obtained may be used as evidence against him in a criminal proceeding, may move for the return of such property or for the suppression of its use as evidence. The court shall hear evidence upon any issue of fact necessary to determination of the motion
 If the motion is granted, the property shall be restored unless otherwise subject to lawful detention, and in any event it shall not be admissible in evidence in any criminal proceeding against the moving party.
 If the motion as denied, the order denying such may be reviewed on appeal from a judgment of conviction notwithstanding the fact that such judgment of conviction is predicated upon a plea of guilty.
 
 
 [4]
 The inadequacy of this remedy here is apparent, see Dombrowski v. Pfister, 380 U.S. 479, 486-487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); apart from doubt as to the feasibility of immediate trial, appellees' argument necessarily assumes that the village justice would deliver a perfect charge or direction to the jury and, if the former, that the jury would precisely follow his instructions
 
 
 [5]
 The case does not involve an application of the 'abstention' doctrine-- a principle devised to allow state courts first to determine issues of state law and often employed in the hope of avoiding constitutional questions by doing so. See Note, Federal Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 604, 605 (1967). All here concerned concede that the mass seizures were unconstitutional
 
 
 [6]
 While the statute was repealed as obsolete in view of the merger of law and equity, 62 Stat. 992 (1948), the principle remains intact. Cf. Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 382 at n. 26, 27, 69 S.Ct. 606, 93 L.Ed. 741 (1949)
 
 
 [7]
 The court said:
 The statute does not empower the magistrate himself to restore the property, nor does it mandate him to direct its restoration by anyone else. It simply declares the obligation of the one possessing the property-- in this case the property clerk-- to restore it to the person from whom it was unlawfully seized 'unless otherwise subject to lawful detention.'
 The onus is therefore on the property clerk to ascertain whether or not the property is 'subject to lawful detention.' The release by the district attorney is not determinative; all it certifies is that he 'has no further need of the property,' and that he has no objection to its delivery to one who proves to the 'satisfaction' of the property clerk his right to possession. That the property was taken from petitioner is no proof of his right to its possession; there may be others who claim title.