**Andres and Nancy SANTIAGO**
**and**
**Alvin and Florence Devalos, on behalf of themselves and all others similarly situated, Plaintiffs,**
**v.**
**Lawrence P. McELROY, Edward Cohen, Larry Snyder, Morris Winitz, Warren G. Brown, Al Sacks, Morton L. Pinsker, Leonard D. Rosenfeldt, Jerold J. Cohen, Joseph Stone, George Landsberg, David H. Brown, Howard Garbeil, Harry Chernoff, Defendants,**
**and**
**Joseph H. Kass Co., Intervening Defendant.**

**Civ. A. No. 69-2792.**

United States District Court, E. D. Pennsylvania.

Oct. 26, 1970.

Sharon Kaplan Wallis, Philadelphia, Pa., for plaintiffs.

John J. Poserina, Jr., Philadelphia, Pa., for defendants.

Berthold W. Levy, Philadelphia, Pa., for intervening defendant.

Before VAN DUSEN, Circuit Judge, and LORD and FULLAM, District Judges.

## OPINION

JOSEPH S. LORD, III, District Judge.

This action was instituted on November 25, 1969, by Andres and Nancy Santiago and Alvin and Florence Devalos, on behalf of themselves and all persons similarly situated. The complaint alleged that the defendants [1] perform levies and sales pursuant to the distress for rent procedures set forth in the Landlord and Tenant Act of 1951, 68 Pa.Stat. §§ 250.302–313, and argued that such acts by defendants violate the due process and equal protection clauses of the Fourteenth Amendment [2] and the provisions of 42 U.S.C. § 1983. Plaintiffs prayed that the court (1) enjoin the defendants from levying on or selling goods pursuant to the distraint procedures of the Act of 1951, and (2) declare that levies would be equally unconstitutional if performed pursuant to the common law of distress. The court issued a temporary restraining order on November 25, 1969, which ordered de-

---

1. At the time suit was brought all defendants held the office of constable in the City of Philadelphia.

2. More particularly, plaintiffs complain that the defendants' conduct violates (1) their right not to be deprived of property without procedural due process, (2) their right to privacy, (3) their right to be free from unreasonable searches and seizures, and (4), their right to the equal protection of the laws.

fendants Cohen and Snyder not to sell or otherwise interfere with the named plaintiffs' possession of their property.

After the convening of a three-judge court pursuant to 28 U.S.C. §§ 2281–2284, the temporary restraining order was continued until a formal hearing could be held. Such a hearing was held on December 12, and thereafter (1) the plaintiffs' motion for determination of the class, defined in the motion as "* * * the class of low and moderate income tenants residing in the City of Philadelphia, Pennsylvania," was granted, (2) the Philadelphia Board of Realtors' motion to intervene as a defendant was conditionally granted, and (3) a preliminary injunction was entered ordering

> "* * * that all defendants who have been served or who are represented by counsel of record, their agents, servants and employees and all persons acting by, through or under them, or by their order, be and they hereby are restrained from selling any property belonging to the members of the plaintiffs' class or their families, and from interfering with the plaintiffs' possession and control of the aforementioned personal property of the members of the plaintiffs' class, pursuant to or under color of Article 3, Section 302 of the Pennsylvania Landlord and Tenant Act of 1951 * * *."

On December 12, 1969, the defendants also filed a series of motions under Rule 12, Fed.R.Civ.P.; argument on these motions was postponed until the final hearing set for January 16, 1970. On December 17, 1969, Joseph H. Kass Co., a landlord, moved to intervene as a de-fendant. On January 16, 1970, the final hearing was held, the preliminary injunction was extended to enjoin, in addition to sales, the "* * * advertising for sale, or threatening to sell * * *", and the case was taken under advisement.

Plaintiffs herein are challenging a procedure of undoubtedly ancient origin. 2 Pollack and Maitland, The History of English Law *573. Blackstone defined distress as the practice of "* * * taking a personal chattel out of the possession of the wrong-doer into the custody of the party injured, to procure a satisfaction for the wrong committed." Blackstone, Commentaries *6. Though this originally seems to have been a thoroughly extra-judicial procedure, 2 Pollack and Maitland, The History of English Law *573, by the thirteenth century most distresses were closely regulated and could be made only if leave from a court had been first obtained. *Id.*

Certain forms of distress retained the character of self-help, however, the prime one being the right of landlords to distrain tenants for rent in arrears. *Id.* at * 573, 574; 3 Holdsworth, History of English Law 285 (3 ed. 1923). The common law permitted the landlord, independent of the legal process, to take his tenant's chattels and hold them, but it sternly prohibited him from selling the distrained property. 10 Halsbury, Laws of England 440 (2 ed. 1933).[3] It was only with the passage of the Sale of Distress Act of 1689, 2 Will. and Mar., ch. 5, § 2, that the landlord was empowered, if certain circumstances obtained,[4]

---

3. Hence, distraint was not a mode of directly satisfying a debt, but was solely a means of persuading the tenant (1) to pay his arrears or (2), to offer gage and pledge, *i. e.*, to post bond as security for performance of an act, Black's Law Dictionary, p. 807 (4 ed. 1951), that he would contest the landlord's claim in court. If the tenant was so persuaded, the landlord had to return the chattels. 2 Pollack and Maitland, The History of English Law *574. If the tenant was not so persuaded, the landlord could merely continue to hold the chattels and the distress availed him not at all. 3 Blackstone, Commentaries *14.

4. "* * * if the tenant or owner do not, within five days after the distress is taken, and notice of the cause thereof given him, replevy the same with sufficient security, the distrainor, with the sheriff or constable, shall cause the same to be appraised * * * and sell * * * the same. * * *" 2 Blackstone, Commentaries *14.

to sell the distrained goods in satisfaction of the claim for rent.

If a landlord did not distrain in accordance with legal requirements, he exposed himself to liability in a suit by the tenant. The tenant's sole remedy at early common law was to post security and sue in replevin. 3 Holdsworth, History of English Law 283 (3 ed. 1923).[5] By the end of the medieval period, however, the action of trespass was allowed to be used as an alternative to replevin, *id.* at 285, and, beginning in the late sixteenth century, the spheres of replevin and trover began to overlap. *Id.* at 285, 286. Even though replevin ceased to be the only available remedy, however, it continued to occupy a unique and essential place in the remedial scheme: it seems to be the only form of action which assured a tenant that, until a court ruled adversely to him on the merits of the underlying claim, (1) he would have a right to possess the chattels that had been levied upon, and (2) those chattels would not be sold pursuant to the Sale of Distress Act of 1689.

In Pennsylvania before 1772, the landlord's remedy of distraint was governed, generally, by the English common law. The Landlord and Tenant Act of March 21, 1772, 1 Sm.L. 370 (repealed 1951), marked the first attempt in Pennsylvania to codify this law. Comment, The Pennsylvania Landlord and Tenant Act of 1951, 13 U.Pitt.L.Rev. 396, 397 (1952). But this Act went beyond mere codification: it expanded the landlord's rights by including a provision which empowered landlords to sell distrained goods.[6]

The Landlord and Tenant Act of April 6, 1951, 68 Pa.Stat.Ann. § 250.101 et seq., the next legislation in the area and the statute which governs today, made no fundamental changes in the rights of landlords to distrain or in the rights of tenants to protect themselves in instances of distraint.

Under the Act of 1951, the landlord or his duly authorized agent is empowered, whenever the landlord concludes that rent is due and owing, to distrain all personal property on the tenant's premises which is not statutorily exempt[7] from levy. 68 Pa.Stat.Ann. § 250.302. To render the levy complete there must be, generally, some seizure of the goods distrained on. Derbyshire Bros. v. McManamy, 101 Pa.Super. 514 (1931). Thereafter, the landlord has the right

5. "The ordinary course of the action was as follows: The sheriff, on application made to him by the distrainee, replevies the goods, *i. e.*, redelivers them to the distrainee upon his giving security to prosecute his action and to return the things distrained if he loses his action. If the sheriff could not replevy the property distrained because it had been eloigned (removed), by the distrainor, the distrainee could get a writ of Withernam directing the sheriff to take an equal amount of the distrainor's property, and to keep it till the distrainor restored the property which he had taken. The distrainor could always stop the action of replevin by claiming to be the owner of the goods; and as this claim was often made merely to delay the proceedings, the writ of *de proprietate probanda* was devised early in the fourteenth century which enabled the sheriff to determine summarily the question of ownership. If the question of ownership was determined against the distrainor the goods were delivered back to the distrainee. The latter then brought his action of replevin against the former. The former defended it by 'avowing,' *i. e.*, by pleading the circumstances which showed that he has the right to distrain. If he succeeded the court awarded 'a return,' *i. e.*, ordered the goods distrained to be restored to him. If he failed he must pay damages for a wrongful distress." 3 Holdsworth, History of English Law 283 (3 ed. 1923).

6. The Sale of Distress Act of 1689 had not governed in Pennsylvania. The Pennsylvania Landlord and Tenant Act of 1772 provided for sales in essentially the same circumstances as provided for in the Act of 1689.

7. 68 Pa.Stat.Ann. §§ 250.401–404; 12 Pa. Stat.Ann. § 2174; 51 Pa.Stat.Ann. § 1–840. The exempt property includes, *inter alia*, personal property to the value of $300, wearing apparel, and property under a lease or sale contract subject to a security interest.

to impound the distrained property. McElroy v. Dice, 17 Pa. 163, 168 (1852).

The tenant may, if he acts within five days after the notice of the levy,[8] regain possession of his property by posting a bond for double the value of the goods distrained and suing in replevin. 68 Pa.Stat.Ann. § 250.306 and 12 Pa.Stat. Ann. § 1824. If there is no replevin action instituted within this five-day period, then the landlord may proceed to have the goods appraised, § 250.308, and to notify the public of the date of sale. § 250.309.[9] On the date fixed for sale the "* * * sheriff, deputy sheriff, constable or deputy constable * * *" publicly sells the distrained goods. *Id.*

In evaluating the contention that this scheme deprives plaintiffs of their constitutional rights, we consider the following evidence which we find as facts.

1. Plaintiffs Andres and Nancy Santiago, together with their eight children, currently occupy and rent premises in Philadelphia. Prior to August 1969, Mr. Santiago's take-home income, supplemented by a public assistance grant, was approximately $160 per week. After a disabling illness, the family's income dropped in August, 1969, to approximately $120 per week, coming entirely from a public assistance grant. The family has no savings, and the bimonthly assistance check is used almost entirely to pay for outstanding bills and to buy food stamps.

2. The family moved to its present residence in 1966, contracting to pay a monthly rent of $65. The family was rejected for Public Housing in 1968 as "overincome," but an application following Mr. Santiago's illness was accepted, although he was told there would be a substantial waiting period.

3. The family's present residence was declared "unfit for human habitation" on July 22, 1968. All rents between that time and October 10, 1969, were paid into escrow, pursuant to the Pennsylvania Rent Withholding Act, 35 P.S. § 1700–1. The first six months rent was returned to the Santiagos on February 26, 1969, because of the landlord's failure to make repairs.

4. The "unfit" certification was removed in June, 1969, and at about the same time or shortly before a "For sale" sign was placed on the premises. In October, 1969, the rent paid into escrow through October 10, 1969, was paid to the owner of the premises.

5. Shortly thereafter, the Santiagos received a letter postmarked October 17, 1969, from a real estate management firm, informing them that the firm represented the new owners and that the rent was being increased to $80 per month. The rent for November was due on or before November 1, 1969.

6. The following day Mrs. Santiago took this letter and a copy of her lease to the Philadelphia Fair Housing Commission. Someone at that office called the management company and told them that under the terms of the lease thirty days' notice was required to alter its terms. The company was further informed that the rent could not be paid until the 10th of each month, since the Santiagos' assistance check never arrived before the 8th.

7. Early in the morning of November 10, 1969, Mrs. Santiago mailed her rent book and money order for $65 to the management company.

8. At approximately 2:00 p.m. on November 10, 1969, Mrs. Santiago answered the door bell, and was handed a

---

8. "Notice in writing of such distress, stating the cause of such taking, specifying the date of levy and the personal property distrained sufficiently to inform the tenant or owner what personal property is distrained and the amount of rent in arrears, shall be given, within five days after making the distress, to the tenant and any other owner known to the landlord, personally, or by mailing the same to the tenant or any other owner at the premises, or by posting the same conspicuously on the premises charged with the rent." 68 Pa.Stat.Ann. § 250.302.

9. The sheriff, deputy sheriff, constable or deputy constable is involved, as a matter of law, in both the appraisement and the notice of sale procedures.

paper which she later discovered was a notice of distraint from the defendant Lawrence P. McElroy. The notice contained a categorical listing of all household goods commonly found in rented premises, and stated that anyone removing any of the goods would be arrested. Mrs. Santiago destroyed this notice after a call to Neighborhood Renewal, a city agency, because she had already mailed the rent and expected the levy to be withdrawn forthwith. As of December 12, 1969, she had not received acknowledgment of receipt of the money order, nor had her rent book been returned.

9. About four or five days after the notice of distraint was delivered, the man returned and handed Mrs. Santiago a notice of sale to be held November 25, 1969. Mrs. Santiago explained to the man that she had paid her rent and that Neighborhood Renewal had told her that she did not have to pay the rent again nor the constable's fee. The man replied that Neighborhood Renewal had nothing to do with it, and that she did have to pay.

10. On December 8, 1969, after commencing this action, and while the temporary restraining order was outstanding, Mrs. Santiago made out a money order in the amount of $80 to the management company. She called the management company to have it return her rent book so that she could pay the rent, but she was told that they would not accept the money order.

11. The Santiagos did not have sufficient assets to be able to post a replevin bond themselves, and they could not afford to pay the premium bondsmen demand.

12. Alvin and Florence Devalos, together with seven of their twelve children, currently occupy a rented premises in Philadelphia.

13. The Devalos family received a notice of distraint in rent for $60 plus a fee of $13.50 on October 23, 1969. The notice was delivered by a tall hefty man, dressed in what appeared to Mrs. Devalos to be a police uniform, who carried a gun in a holster and wore a badge with a number and name on it. He represented himself to be a constable.

14. On November 7, 1969, the Devalos residence was certified "unfit for human habitation."

15. On November 21, 1969, the Devalos family received a duplicate of a sale bill, advertising a sale of "all household goods on the premises," to be held November 26, 1969.

16. Based on the uncontradicted testimony of a landlord-and-tenant specialist working with Community Legal Services, in more than 90% of all cases, no valid levy is ever made on household belongings. Other common defenses to sale include payment of rent, use of rent to make repairs, and mistakes in rent due.

17. Of those persons whose income qualifies them for legal assistance from Community Legal Services, only 2% can afford to post a bond to prevent the sale of their possessions.

18. Very few, if any, low and moderate income tenants are able to raise defenses, even if they are able to prevent immediate sale of their possessions by bringing an action in replevin with bond. Only one-third of the poor families in Philadelphia are aware of the existence of Community Legal Services.

19. By the terms of the standard leases in common usage in Philadelphia, tenants agree to distress procedures and waive the statutory protections afforded them. The Form 42 and 50 leases are the most commonly used in Philadelphia. Each provides that, in the event the lessee defaults on his rent payment, the lessor or his agent

"May enter the premises, and without demand proceed by distress and sale of the goods there found to levy the rent and/or other charges herein payable as rent, and all costs and officers' commissions, including watchmen's wages and sums chargeable to Lessor, and further including a sum equal to 5% of the amount of the levy as commissions to the constable

or other person making the levy, shall be paid by Lessee, and in such case all costs, officers' commission and other charges shall immediately attach and become part of the claim of Lessor for rent, and any tender of rent without said costs, commission and charges made after the issue of a warrant of distress shall not be sufficient to satisfy the claim of the Lessor. Lessee hereby expressly waives in favor of Lessor the benefit of all laws now made or which may hereafter be made regarding any limitation as to the goods upon which, or the time within which, distress is to be made after removal of goods, and further relieves the Lessor of the obligation of proving or identifying such goods, it being the purpose and intent of this provision that all goods of Lessee, whether upon the demised premises or not, shall be liable to distress for rent. Lessee waives in favor of Lessor all rights under the Act of Assembly of April 6, 1951, P.L. 69, and all supplements and amendments thereto that have been or may hereafter be passed, and authorizes the sale of any goods distrained for rent at any time after five days from said distraint without any appraisement and/or condemnation thereof. The Lessee further waives the right to issue a Writ of Replevin under the Pennsylvania Rules of Civil Procedure, No. 1071 &c. and Laws of the Commonwealth of Pennsylvania, or under any other law previously enacted and now in force, or which may be hereafter enacted, for the recovery of articles, household goods, furniture, etc., seized under a distress for rent or levy upon an execution for rent, damages or otherwise; all waivers hereinbefore mentioned are hereby extended to apply to any such action; * * *

"Lessee expressly waives the benefits of all laws, now or hereafter in force, exempting any goods on the demised premises, or elsewhere from distraint, levy or sale in any legal proceedings taken by the Lessor to enforce any rights under the lease. * * *"

Provisions contained in other typical leases are similar in scope.

20. Levies have, as a matter of practice, been carried out by persons who hold the office of constable.

21. Notices of sale have been sent out by constables acting in their official capacity.

22. As of February 10, 1970, the office of constable in the City of Philadelphia was abolished and the terms of office of all incumbents terminated. The duties performed by constables under the Landlord and Tenant Act of 1951 are now performed by landlord and tenant officers of the Municipal Court.

23. Defendants Howard Garbeil, Leonard J. Rosenfeldt, George Landsberg, Joseph Stone, Jerold J. Cohen, Al Sacks, Morton L. Pinsker, Morris Winitz, Edward Cohen, Larry Snyder, are now landlord and tenant officers of the Municipal Court in Philadelphia.

24. Defendants Howard Garbeil, Leonard J. Rosenfeldt, George Landsberg, Joseph Stone, Jerold J. Cohen, Al Sacks, Morton L. Pinsker, Morris Winitz, Edward Cohen, Larry Snyder, threaten to perform the same official, e.g., notices of sale, and nonofficial, e.g., levies, acts which they threatened to perform when they were constables.

25. All defendants herein, including the intervenor, act with knowledge of and pursuant to the provisions of the Landlord and Tenant Act of 1951.

26. Joseph H. Kass Co. admits that it frequently avails itself of the procedures in 68 Pa.Stat.Ann. § 250.302 et seq.

Before we proceed further, it is necessary to clarify who is suing and who is being sued. First, in light of the fact that all the evidence developed in this case relates to distraint of low income tenants, and there being no showing that the same facts obtain in the case of moderate income tenants, we amend our earlier order and re-define the plaintiff class to be the class of low income

tenants[10] residing in the City of Philadelphia, Pennsylvania. Second, we now grant the motion of Joseph H. Kass to intervene as a defendant, and deny the motion of the Philadelphia Board of Realtors.

## I. *Jurisdiction*

There can be no question that plaintiffs' four claims raise substantial constitutional issues. However, it is argued that these claims are all "dependent for [their] existence upon the infringement of property rights," Hague v. C.I.O., 307 U.S. 496, 531, 59 S.Ct. 954, 971, 83 L.Ed. 1423 (1939) (Stone, J., concurring) and are therefore not cognizable under 28 U.S.C. § 1343(3). *E.g.*, Hague v. C.I.O., at 531–532, 59 S. Ct. 954 (1939) (Stone, J., concurring) (civil rights, but not property rights, are covered by § 1343(3)); Eisen v. Eastman, 421 F.2d 560 (C.A.2, 1969); *see* National Land & Investment Co. v. Specter, 428 F.2d 91 (C.A.3, 1970) *(dictum)*. *But see* Joe Louis Milk Co. v. Hershey, 243 F.Supp. 351, 354 (N.D. Ill.1965) (distinction between civil and property rights rejected outright); Note, The "Property Rights" Exception to Civil Rights Jurisdiction, 43 N.Y.U.L. Rev. 1208 (1968); Note, The Proper Scope of the Civil Rights Acts, 66 Harv.

L.Rev. 1285, 1288–91 (1953). Nonetheless, even assuming *arguendo* that 28 U.S.C. § 1343(3) does not cover property rights and further assuming that plaintiffs' claims are all dependent for their existence upon the taking of household goods, we find that this case involves much more than mere property rights. The dispossession and sale of household belongings may leave the low income family—already operating at subsistence level—without cribs, beds, dishes, chairs and other necessities of life. As Judge Mansfield recently indicated, without the minimal necessities of life " * * * our expressed fundamental rights and liberties frequently cannot be exercised and therefore become meaningless." Rothstein v. Wyman, 303 F.Supp. 339, 346, 347 (S.D.N. Y.1969). We think it is reasonable to *conclude that recent Supreme Court rulings dealing with welfare rights*[11] *decide, at the very least, that the deprivation of this kind of property, i.e., property necessary to keep a family at subsistence level, is covered by 28 U.S.C. § 1343(3). See Eisen v. Eastman, 421 F.2d 560, 564 (C.A.2, 1969) (dictum)*; Roberge v. Philbrook, 313 F.Supp. 608 (D.Vt.1970). Accordingly, we decide that we have jurisdiction over plaintiffs' constitutional claims.[12]

---

10. More particularly, this is the class of tenants who have an income which qualifies them as "poor" under the guidelines published periodically by the Office of Economic Opportunity. The latest guidelines [Revised OEO Income Poverty Guidelines, OEO Instruction 6004–1a (January 30, 1970)] for poor families in urban areas are

| Family size | Income |
|---|---|
| 1 | $1800 |
| 2 | 2400 |
| 3 | 3000 |
| 4 | 3600 |
| 5 | 4200 |
| 6 | 4800 |
| 7 | 5400 |
| 8 | 6000 |
| 9 | 6600 |
| 10 | 7200 |
| 11 | 7800 |
| 12 | 8400 |

Add $600 for each additional family member.

11. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); King v. Smith, 392 U.S. 309 (1968).

12. The Second Circuit, in Escalera v. N.Y.C. Housing Authority, 425 F.2d 853 (C.A.2, 1970), used a different route to find that § 1343(3) gives jurisdiction over the claim that property has been taken without procedural due process. Therein the court decided that the civil right/property right distinction drawn by Justice Stone in *Hague* was valid, but it then gave that distinction a curiously restrictive reading by holding that the right not to be deprived of property without *procedural* due process is a civil right.

Defendants contend that even if we have jurisdiction over these claims we should not exercise it because plaintiffs have not exhausted their state remedies. Exhaustion of state judicial remedies is not necessary under the Civil Rights Act. Monroe v. Pape, 365 U.S. 167, 180–183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); see McNeese v. Board of Education, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). We are aware that this general rule has become riddled with exceptions. E.g., Potwora v. Dillon, 386 F.2d 74, 77 (C.A.2, 1967); Moore v. Carroll, 315 F.Supp. 1129 (E. D.Pa., 1970). Nonetheless, we are of the opinion that in this case it is appropriate for us to exercise equity jurisdiction.

## II. *The Merits*

The Civil Rights Act, 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution or law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Plaintiffs contend that levies and sales by the defendants, insofar as they are carried out pursuant to 68 Pa.Stat. Ann. § 250.302 et seq. are acts "under color of law" which deprive them of certain Fourteenth Amendment rights. We now decide that plaintiffs have not sustained their burden of showing that the levy and steps taken prior to sale, harm them in any fashion,[13] and we therefore conclude that this record does not present an adequate basis for finding the provisions of Article III of the Landlord and Tenant Act of 1951, other than the provision authorizing sale of the tenant's property after distress, violate the Fourteenth Amendment.[14] See Mishkin v. New York, 383 U.S. 502, 512–513, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); C.I.O. v. McAdory, 325 U.S. 472, 475, 65 S.Ct. 1395, 89 L.Ed. 1741 (1945); Liverpool, New York & Philadelphia Steamship Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885).

The "action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States," Shelley v. Kramer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947). Adickes v. S. H. Kress & Co., 398 U.S. 144, 169, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There is sufficient state involvement in distress sales—both because under 68 Pa. Stat.Ann. § 250.309 state officials perform these sales, e.g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473 (1961), and because it is only due to statutory authorization that distress sales can be performed at all, e.g., Klim v. Jones, 315 F.Supp. 109 (N.D.Cal.1970); see Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1967)—to satisfy the state action requirements of the Fourteenth Amendment. Further, since public officials perform sales and have power to do so because they are officials, Mortgage B. & L. Assn. v. Van Sciver, 304 Pa. 408, 416, 155 A. 920 (1931), we find that distress sales are performed "under color of law" as required by 42 U.S.C. § 1983. E.g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473 (1961).

13. Although the notice of distraint received by Mrs. Santiago stated that anyone removing the goods from the house would be arrested, her testimony made clear that her objection was to the sale, which she believed was ordered to force her to move so that the landlord could sell the house. Moreover, there is no evidence that defendants, while levying on plaintiffs' personal property, ever entered onto the plaintiffs' leaseholds.

14. Similarly, we are unable to find, on the basis of this record, that common law levies would be unconstitutional.

Having disposed of these preliminary issues in this manner, we proceed to consider whether distress sales amount to a taking of property without procedural due process. In order to decide in a given case which procedures due process requires, a court must carefully determine and delicately adjust the nature of the private interest affected and the governmental interest involved. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Zemel v. Rusk, 381 U.S. 1, 14, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Wasson v. Trowbridge, 382 F.2d 807, 811 (C.A.2, 1967). It is incumbent upon the court to consider

> " * * * the precise nature of the interest that has been adversely affected, *the manner in which this was done,* the reasons for doing it, the available alternatives to the procedure that was followed * * *, the balance of hurt complained of and good accomplished." Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 163, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

Having reviewed the cases in which these factors have been adjusted, we think it is fair to conclude that due process generally requires

> " * * * the kinds of 'notice' and 'hearing' which are aimed at establishing the validity, or at least the probable validity, of the underlying claim against the alleged debtor *before* he can be deprived of his property or its unrestricted use." Sniadach v. Family Finance Corp., 395 U.S. 337, 343, 89 S.Ct. 1820, 1823, 23 L.Ed.2d 349 (1969) (Harlan, J., concurring).

In *Sniadach*, a Wisconsin wage garnishment statute was struck down on constitutional grounds because it authorized a pre-judgment freeze on wages.[15] The Court opined that, in a situation where a garden variety type of property was being seized, the state's interest in protecting the position of creditors might be sufficient to justify pre-judgment attachment. However, the Court stressed that *Sniadach* involved wages— "* * * a specialized type of property presenting distinct problems in our economic system." It noted that wage garnishment, often based on a fraudulent debt, was a procedure which often drove the wage earner below the poverty level, pressured him to settle the alleged debt in order to get his wages back, and might lead to his being fired. The Court ruled that to justify a pre-judgment taking that was this obvious and onerous the state must prove more than that its statute protects the position of creditors.[16] Rather, the state must (1) present sufficient evidence to show that an *extraordinary* situation "* * * requiring *special* protection to a state or creditor interest is involved," *Sniadach* at 339, 89 S.Ct. at 1821 (emphasis added), and (2) show that the statute is narrowly drawn to meet the unusual condition. Sniadach v. Family Finance Corp., 395 U.S. at 339, 340, 89 S.Ct. 1820. Finding no evidence on which it could conclude that a special situation was involved, the statute was declared unconstitutional since it did not provide for notice or a prior hearing.

We find this case to be indistinguishable from *Sniadach*. Herein the landlord, acting on his unilateral claim that rent is owing, has power to levy on his tenant's personal property and to sell that property. The tenant can challenge the distraint by suing in trespass, but in that case his property may be sold long before the litigation is finally decided. In the interim between the sale and the court's decision the tenant is deprived

---

15. In the Wisconsin procedure the clerk of the court issued a summons at the request of the creditors' lawyer and the latter, by serving the garnishee, set in motion the machinery whereby the wages were frozen.

16. There is an obvious, an oft recognized, public interest in ensuring the collectibility of debts. *See* Note, Attachment and Garnishment—Constitutional Law—Due Process of Law, 68 Mich.L.Rev. 986, 994 1970).

of the use and possession of his property; furthermore, even if the tenant succeeds on the merits, he will nonetheless be permanently deprived of his property *in specie*. While it is true that a suit in replevin, if available, would ameliorate the taking somewhat by postponing any sale until after a final decision in the case, it would also mean that the tenant would be deprived of his bond until that decision were to be rendered. At least as to the tenants before us here,[17] any of these deprivations would obviously condemn them "* * * to suffer grievous loss * * *," Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624 (1951) (Frankfurter, J., concurring). We are mindful that certain property is statutorily exempt from levy and sale; however, we find the exemption not sufficiently generous to leaven the impact of the loss in a substantial manner.

■ Defendants contend that, though the impact of the taking may be heavy, the taking has been accomplished by a private party pursuant to a provision in a lease agreement between private parties. Thus, they argue, there has been no taking at all pursuant to 68 Pa.Stat. Ann. § 250.301 et seq., and no state action to measure against the Fourteenth Amendment. We cannot agree. The lease provision permitting levies and sales does not purport to create an independent right in the landlord to distrain; rather, the tenant agrees only that the landlord has the right to act pursuant to 68 Pa.Stat.Ann. § 250.301 et seq. If this provision means anything, it means only that the tenant agrees that, in cases wherein he has defaulted, he will not object on legal grounds to the use of the statutory distress procedure. Insofar as this provision constitutes a purported waiver of the right to raise objections on constitutional grounds to the statutory distress procedure, we feel it is only effective if it qualifies as "an intentional relinquishment or abandonment of a known right or privilege," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). We take judicial notice of the fact that form leases are put before tenants on an "accept this or get nothing" basis, see 6A Corbin, Contracts, § 1376 (1962), and that tenants—who need housing—are compelled to sign. There is no freedom of contract —there is merely a freedom to adhere to the terms of the contract written by the landlord. *See* Swarb v. Lennox, 314 F.Supp. 1091 (E.D.Pa., 1970); Ehrenzweig, Adhesion Contracts in the Conflict of Laws, 53 Col.L.Rev. 1072 (1953). Accordingly, we find that plaintiffs have not waived their right to object on constitutional grounds to the statutory distress procedure.

Defendants also argue that since plaintiffs have signed a waiver of their rights under the Landlord and Tenant Act (*e.g.*, the right not to have certain types of exempt property levied upon and sold), and since they thereby have countenanced even more of a taking than the statute provides for, they should not be heard to complain now that the statutory taking harmed them. However, confronted as we are with an adhesion contract, we conclude that equity does not require that we close our ears to plaintiffs' claim that they are harmed by the statute.[18]

There has been no evidence presented in this case which indicates that the distress procedure is a response to an

---

17. We are not focusing herein on "* * * a case of peculiar hardship arising out of exceptional circumstances," Ownbey v. Morgan, 256 U.S. 94, 104, 41 S.Ct. 433, 435, 65 L.Ed. 837 (1921), but are looking instead at the impact of the statute upon a class as identifiable as the beneficiaries of a known place of residence focused on in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

18. We need not and do not decide whether the waiver is effective under Pennsylvania contract law, but we do note that the lack of real bargaining we have focused on may well be decisive on the state law issue.

extraordinary situation requiring special protection to a state or creditor interest. There has been no evidence which indicates that it is any more difficult to satisfy a judgment against a tenant than against any other debtor, and none which indicates that distress is central to the state's interest in protecting the housing market.[19] The defendants argue that distress is ancient, and that the landlord-tenant relation has been given special treatment since early common law. While this is true, it must be kept in mind that distress *sales* were not authorized until the Sale of Distress Act of 1689, 2 Will. and Mar., ch. 5, § 2. And even if distress sales were to qualify as a time-honored procedure, it is also true that the blessing of age wears out. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); Sniadach v. Family Finance Corp., 395 U.S. 337, 343, 89 S.Ct. 1820 (1969); Laprease v. Raymours Furniture Company, Inc., 315 F.Supp. 716 (N.D.N.Y.1970). In light of the terrible impact of the taking herein, we find that this nod in the direction of the past is insufficient to justify sales incident to the distress procedure. Accordingly, we find that distress sales, insofar as they do not follow a hearing of some sort before the tenant is deprived of his property, violate the fundamental principles of due process. Sniadach v. Family Finance Corp., 395 U.S. 337, 443, 89 S.Ct. 1820 (1969); Laprease v. Raymours Furniture Co., Inc., 315 F.Supp. 716 (N.D.N.Y. 1970); Klim v. Jones, 315 F.Supp. 109 (N.D. Cal.1970). Since we so decide, we need not treat the plaintiffs' other constitutional claims.

### Conclusions of Law

1. In light of 42 Pa.Stat.Ann. § 1062.1 (Supp. 1, March 10, 1970), defendants Lawrence P. McElroy, Warren G. Brown, David H. Brown, Harry Chernoff, no longer threaten to levy or sell pursuant to the distress provisions of 68 Pa.Stat.Ann. § 250.302 et seq., and the case is moot as to them.

2. Defendants Howard Garbeil, Leonard J. Rosenfeldt, George Landsberg, Joseph Stone, Jerold J. Cohen, Al Sacks, Morton L. Pinsker, Morris Winitz, Edward Cohen, Larry Snyder and Joseph H. Kass Co. are ordered permanently enjoined from selling any property pursuant to the provisions of 68 Pa.Stat. Ann. § 250.309.

Counsel will submit an appropriate order in accordance with the foregoing.

VAN DUSEN, Circuit Judge, and FULLAM, District Judge, concur.

---

19. Further, we note that "the public interest in ensuring that a fund is available for collection purposes is only slightly advanced by allowing attachment of personalty prior to adjudication, since a [debtor] would seldom be moved to transfer a necessity in order to defraud a creditor." Note, Attachment and Garnishment—Constitutional Law—Due Process of Law, 68 Mich.L.Rev. 986, 1001 (1970).