**Carol MATTINGLY, Individually, and her minor children, et al., Plaintiffs,**

v.

**Gabriel ELIAS and Bella Angel, Defendants.**

**Civ. A. No. 69–2788.**

United States District Court, E. D. Pennsylvania.

April 21, 1971.

Lorry W. Post, John C. Marston, Bucks County Legal Aid Society, Doylestown, Pa., for plaintiffs.

William J. Curlin, Begley, Carlin, Mandio, Kelton & Popkin, Bristol, Pa., for defendants.

## OPINION

HIGGINBOTHAM, District Judge.

### I. INTRODUCTION.

The present action was instituted by certain tenants[1] of Warminster Heights, a housing project owned and operated by the individual and corporate defendants in Warminster Township, Bucks County, Pennsylvania.[2] Claiming that the degree of past and present Federal and state assistance to this project, as well as its essential public character, require that the defendants' conduct be measured by standards applicable to a government landlord, the plaintiffs have sought to found their action on 42 U.S.C. § 1983 and 1985 and 28 U.S.C. § 1343.[3] The plaintiffs seek a declaratory judgment that the thirty (30) day lease which

---

1. The named plaintiffs seek to maintain this suit as a class action on behalf of all of the approximately 5,000 tenants of Warminster Heights, pursuant to F.R. C.P. 23(b) (2). Carol Mattingly, one of the named plaintiffs and a tenant at the time this suit was filed in December, 1969, no longer resides at Warminster Heights. (Tr., July 8, 1970, p. 236.)

2. The defendant, Gabriel Elias, is the president and sole stockholder of Northchester Corporation, which is the 100% beneficial owner of Warminster Heights (Tr., July 9, 1971, pp. 142–143.)

3. The plaintiffs contend that jurisdiction is "further conferred" on this Court by 28 U.S.C. §§ 2201 and 2202, relating to declaratory judgments. But there is no jurisdiction in this Court to issue a declaratory judgment if Federal jurisdiction is otherwise lacking. "The Federal Declaratory Judgment Act * * * confers no additional jurisdiction, but applies only to controversies otherwise within its jurisdiction." Ambassade Realty Corp. v. Winkler, 83 F.Supp. 227, 229 (D.Mass., 1949). Whether there is independent Federal jurisdiction is considered, *infra*.

tenants of Warminster Heights are required to sign is unconscionable and void; a declaratory judgment that a warranty of habitability should be implied in any lease agreement between the tenants and defendants; and an injunction against the alleged retaliatory eviction of tenants for reporting housing code violations, seeking legal counsel and engaging in organizational activities. The answer to the complaint has challenged the propriety of jurisdiction under 42 U.S.C. § 1983.[4] To resolve the basic questions of jurisdiction in the present action, the factual background of this case should first be briefly sketched.

The defendants own and operate a housing project in Warminster Township which was constructed by the Federal Government in 1942 to provide housing for defense workers.[5] In 1957 the project was sold by the United States Government to the defendants. As part of the financing of this sale, the Federal National Mortgage Association provided a mortgage which has a present balance of $1,500,000. Since its construction, and particularly since its acquisition by the defendants, the Warminster Heights project has provided housing for low and medium income families. At present, the project has approximately 1,000 family dwelling units with about 50 vacant and uninhabitable units and a total residential population of approximately 5,000.

All tenants execute a lease with a term of thirty days. In addition to abiding by the terms of the lease, the tenants are required to comply with certain rules and regulations promulgated from time to time by the landlord. The landlord supplies electricity to tenants which is purchased at bulk rates from the Philadelphia Electric Company by a separate corporation controlled by the landlord.

The landlord from time to time avails himself of the eviction procedures provided by the Landlord and Tenant Act.[6] According to this procedure, after the landlord files a complaint, a hearing is held before the district justice and an order of possession is issued thereafter if judgment is entered for the landlord.[7] It is alleged that the local municipal police assist the landlord in effecting the eviction of a tenant. Depositions indicate that on three occasions in the last 13 years, the landlord has called upon the local police for this purpose.[8] The defendants contend that in these instances, the function of the police has been to maintain order in the event that force would be necessary to regain possession of the leased premises. In none of the instances where the police were present was force necessary. The plaintiffs also aver that the local police patrol the project. The defendants assert that the purpose of the patrolling is to maintain peace and quiet in the project and that the defendants are entitled to such protection as property owners and taxpayers.

The plaintiffs' complaint alleges and the record indicates that there are nu-

4. 42 U.S.C. § 1983 provides:
   "Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (17 Stat. 13, Act of April 20, 1871.)

5. The Warminster Heights project covers an area of approximately 143 acres with five miles of streets and roadways running through the project. (Tr., July 9, 1970, p. 57.)

6. Landlord and Tenant Act of 1951, April 6, 1951, P.L. 69, 68 Pa.Stat. 250.101 et seq.

7. Pennsylvania Rules of Conduct, Office Standards and Civil Procedure for Justices of the Peace (adopted by the Supreme Court of Pennsylvania, October 15, 1969, effective January 1, 1970) Rules 501–521. Rule 581 notes that 68 P.S. §§ 250.502–504, 250.507–510 are suspended absolutely.

8. Tr. Dep., July 9, 1970, p. 119.

merous and substantial defects in the housing project which the landlord has failed to correct, or in some instances corrected only after prolonged delay. Allegations of serious defects and inadequacies in plumbing, in the maintenance of walls and ceilings, in the removal of trash and garbage and in the breakdown of basic appliances in the apartments are substantiated in the record developed in this proceeding.

I think that a fair landlord owes his tenants a management policy more sensitive than that evidenced by the past conduct of the defendants. Yet, the Federal Courts are not the forum for eradicating all acts of injustice to the poor, the deprived and the weak. Despite the substantial and just grievances which the tenants of Warminster Heights can point to as part of their daily experience, this Court does not have the appropriate federal jurisdictional power to grant relief to them.

## II. CONDITIONS AT WARMINSTER HEIGHTS

The record indicates numerous instances where the obligations accepted by the defendants in this mortgage agreement have not been fulfilled. These violations include either prolonged delay in repairing or complete failure to correct serious defects in the plumbing, the structure of the buildings and the operation of essential appliances. The following examples illustrate the failures and inadequacies in the repair of the dwelling units and the maintenance of the premises of Warminster Heights.

Richard Deasey, a reporter for a Bucks County newspaper, rented a unit at Warminster Heights in order to gain some direct exposure to the conditions about which tenants had complained, and testified to the following defects in the condition of his apartment. He found the roof of the living room caving in, several inches of curdled milk

in the refrigerator, the oven unit of the stove "all rusted and broken", the bedroom ceiling collapsing and leaking with mold forming around the point of the leak. He found a part of the toilet on the bathroom floor and the bathroom sink "partly falling off the wall." He described the general condition of the bathroom as "filthy." (Tr. July 14, 1970, pp. 21–22.) The wiring in the boiler room of his apartment was exposed, and there was water on the floor. There was a hole approximately five feet square above the boiler which went through to the roof. One of the doors to the adjoining coal bin did not fit tightly, and during the winter months' cold air seeped into the apartment.[9] Although he complained on numerous occasions, asking for adequate repairs to be made, Mr. Deasey testified that the oven was never fixed and, therefore, he was never able to cook in his apartment. Also, when the toilet was flushed, it leaked at its base over the bathroom floor. Although he "complained constantly" the toilet was "never repaired." [10]

Anna Jaggers, who has resided at Warminster Heights for four years with her husband and seven children, testified that a workman of the landlord installed a new toilet for her apartment but broke the toilet in the process of installation.[11] Although the toilet did not function properly, she was still charged $15.00 for its installation. When Mrs. Jaggers first moved into her apartment, the walls were broken in her upstairs bedroom. The cement steps of her apartment wash away each time it rains. A window which Mrs. Jaggers had frequently asked to have repaired fell down on her left wrist, requiring treatment at a hospital. The window still had not been fixed at the time of her testimony.[12]

Mrs. Shirley Daniels signed a lease for an apartment at Warminster Heights, and paid rent for March, April

9. Tr., July 14, 1970, p. 23.
10. Tr., July 14, 1970, p. 26.
11. Tr., July 14, 1970, p. 30.
12. Tr., July 14, 1970, p. 48.

and May of 1970, but because the broken toilet in the apartment was never fixed, she and her children never slept overnight at the apartment.[13]

Laura Hamel, a resident of Warminster Heights since 1967, testified that her hot water heater did not work for the first five months that she lived in the apartment. Although she complained, often as frequently as once a day, these complaints did not lead to the prompt repair of the defective unit.[14] Her oven also did not work for a period of five months and was finally fixed by a friend, rather than by an employee of the landlord.[15]

Mrs. Mildred Hunt, who lives at Warminster Heights with her husband and three children, asked for a hole in the floor of her kitchen to be repaired, but was told to "forget it" by an employee of the landlord. The hole in her kitchen runs from the sink to the wall and covers "about one-fourth of the kitchen.[16] Mrs. Hunt testified that her husband tried to fix the hole in the kitchen floor but that the landlord refused to provide the wooden beam needed for this repair. She also testified that because of a hole in the wall of her bathroom "I can sit in my bathtub and watch the man next door in his." [17] Although she has constantly asked to have this condition corrected, no one from the landlord's office visited her apartment to investigate or correct this condition. Also, a board missing at the juncture of the roof with one of the sidewalls of her dwelling allowed cold air to flow into her apartment.[18] Mrs. Hunt also testified that garbage had been allowed to remain outside her apartment uncollected for about six weeks, and that rats played all over the garbage while it remained uncollected.[19]

Marian Heiber, who has resided at Warminster Heights for two years with her husband and four children, testified that when her family moved in the coal stove did not work; in spite of frequent complaints, the stove was not repaired; and the house was therefore extremely cold during the winter. Her three year old child had pneumonia twice during the winter, and had to be taken away from the house several times. Her husband eventually fixed the stove the following fall.

Raleigh Napes, who was employed by Dr. Elias to do maintenance work between December 1965 and August of 1967, had previously been employed by the City of Philadelphia for fourteen years as a civil engineer. He testified that at the time he moved to Warminster Heights in April 1967, he considered "that the maintenance work was either non-existen[t], or slipshod or non-completed, and this caused continual deterioration of the properties.[20] It was his opinion that none of the maintenance men employed at Warminster Heights were qualified to do the work they were supposed to be doing. He testified that the condition of Warminster Heights "is getting worse every day, there is literally no maintenance at all," just what is absolutely necessary for plumbing, related to "stoppages and very minor stuff." [21]

Gloria J. O'Connor, a resident of Warminster Heights since December, 1968, testified that she almost had a fire in her kitchen because of bare electrical wires in back of her stove.[22] She also stated that the collapsing roof of her back porch was fixed only after months of complaints. After the older roof was torn off, it was left lying in her backyard with nails sticking up from the boards. Mrs. O'Connor also

---

13. Tr., July 14, 1970, pp. 72–73.

14. Tr., July 8, 1970, pp. 6 and 7.

15. Tr., July 8, 1970, pp. 9, 10.

16. Tr., July 8, 1970, pp. 23, 24.

17. Tr., July 8, 1970, p. 24.

18. Tr., July 8, 1970, p. 25.

19. Tr., July 8, 1970, p. 27.

20. Tr., July 8, 1970, p. 118.

21. Tr., July 8, 1970, p. 118.

22. Tr., July 8, 1970, p. 191.

had reported that strong fumes were leaking from a gas tank serving her dwelling, but that this condition was not repaired after a year of complaints.[23]

Alphonsus C. Boyle, supervising sanitarian at the Doylestown and Quakertown District Offices of the Bucks County Department of Health, testified that trash at Warminster Heights was not collected from December, 1968 through February, 1969 (trash collection at Warminster Heights is the responsibility of the owner and manager, Dr. Elias, and his staff). Because of this serious delay, legal action to compel removal of the trash and garbage was commenced by the Bucks County Department of Health.[24] Dr. Boyle termed the accumulation of debris and refuse during this period "a deplorable condition". Dr. Boyle testified that the failure to cut high grass in open areas of the project led to the breeding of mosquitos.[25] Dr. Boyle concluded that the over-all sanitation conditions in Warminster Heights are "very poor" because of rats, mosquito breeding in uncut high grass, weeds and accumulated trash and debris in the open areas.[26]

## III. REQUESTS FOR RELIEF.

The plaintiffs seek three principal forms of relief in regard to the maintenance and operation of Warminster Heights: first, a declaration that Federal and state law require that a warranty of habitability should be implied in the lease agreement between the defendants and the tenants of Warmin-

ster Heights; second, a determination that the present lease which tenants of Warminster Heights are required to sign is unconscionable, contrary to public policy and, therefore, void and unenforceable; and third, an injunction restraining defendants from commencing eviction and other legal proceedings in retaliation against tenants who seek legal counsel, who have become active in community groups or who report violations of health and housing codes to local authorities.[27]

To establish jurisdiction under 42 U.S.C. § 1983, plaintiffs contend that "although the ownership of Warminster Heights is private * * * Warminster Heights is public in character." The public characteristics of the project are alleged to be as follows: (1) Federal credit, in the form of a mortgage with an outstanding balance of $1,500,-000, has been pledged to finance defendants' acquisition of the project; (2) an agency of the Federal Government, the Federal National Mortgage Association, has the right to foreclose on the mortgage under certain circumstances; (3) the interests of the United States of America are being advanced by the defendants in their undertaking to provide housing for low income and impoverished citizens of the United States; (4) the local police department, which is publicly maintained, conducts regular patrols of the community of Warminster Heights at the instruction of the defendants; (5) the defendants have opened up their property to the public in that there is a school on the property, a store open to the public and

---

23. Tr., July 8, 1970, p. 196.

24. Tr., June 29, 1970, p. 11.

25. Tr., June 29, 1970, p. 21.

26. Tr., June 29, 1970, p. 24.

27. Requests for other relief are now moot. A stipulation entered into between counsel and approved by this Court on November 23, 1970 provides that the defendants will no longer engage in their previous practice of cutting off electricity and water to tenants' apartments in an attempt to coerce the payment of rent

and other charges allegedly owed by the tenants. The stipulation also provides that the defendants are enjoined "from holding any constable sales or threatening to hold constable sales on goods of any tenant at Warminister Heights based on a landlord distraint of goods." A decision by a three judge District Court, rendered after the commencement of the present action, bars the distress sale of a tenants property pursuant to 68 Pa.Stat. § 250.302–313 without a prior hearing. Santiago v. McElroy, 319 F.Supp. 284 (E.D.Pa.1970).

a community building serving the entire township of Warminster as well as the Warminster Heights project; (6) public officials, including Warminster Township officials, deem this project to be private property and yet devote much of the resources of Warminster Township to Warminster Heights; for example, the housing inspector of Warminster Township devotes the majority of his time and energy policing Warminster Heights. The amended complaint added the further jurisdictional allegations that in furtherance of "the defendants' design" to charge excessive fees and succeed in their collection, the defendant Elias causes judicial process in the form of landlord tenant complaints to issue from the local district justice of the peace. The plaintiffs allege that in this manner, "the defendant Elias uses the protection and integrity of the state judicial system to legitimize his systematic confiscation of money not owed from tenants." It is also alleged that in furtherance of "the defendants' design" to perform illegal confiscation of property belonging to tenants, defendants request and permit the presence of Warminster Township Police at homes when resistance is expected to illegal seizures.

There are two principal issues to resolve in order to determine whether plaintiffs are entitled to relief: first, even if the character of Warminster Heights is sufficiently public to make applicable the guarantees of the Fourteenth Amendment and 42 U.S.C. § 1983, in what particular aspect has the conduct of the defendants' abridged rights protected by the Fourteenth Amendment and 42 U.S.C. § 1983; and

second, does the United States Housing Act of 1937[28] and the Housing Act of 1949[29] which, as amended, are found in 42 U.S.C. §§ 1401–1436 and §§ 1441–1490c and the mortgage contract between the defendant and the Federal National Mortgage Association provide a basis for the present plaintiffs to establish federal question jurisdiction under 28 U.S.C. § 1331.

## IV.  THE HOUSING ACTS OF 1937 AND 1949: JURISDICTION UNDER 28 U.S.C. § 1331.

I will first consider whether the United States Housing Acts of 1937 and 1949, and the covenants of the mortgage agreement signed by the defendants, provide a jurisdictional basis in conjunction with 28 U.S.C. § 1331[30] for this Court to determine (1) whether a warranty of habitability should be implied in the leasehold agreement between the tenants and the defendant landlord, and (2) whether the present thirty day lease tenants are required to sign is unconscionable and void as a matter of law.[31]

42 U.S.C. § 1401 declares it to be "the policy of the United States to promote the general welfare of the Nation by employing its funds and credit * * * to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low income, in urban, rural, non-farm and Indian areas that are injurious to the health, safety, and morals of the citizens of the Nation." 42 U.S.C. § 1441 declares it to be the object of national housing policy to realize as soon as feasible "the goal of a decent home and a suitable living environment for every

28. 50 Stat. 888, Sept. 1, 1937, C. 896.

29. 63 Stat. 413, July 15, 1949, C. 338.

30. 28 U.S.C. § 1331 provides, in pertinent part: "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest, and costs, and arises

under the Constitution, laws, or treaties of the United States.

31. This possible basis of jurisdiction was suggested but not fully developed in the plaintiffs' brief. Because of the importance of the issues presented it seemed appropriate to fully consider whether jurisdiction could be established under this theory.

American family * * * " The record indicates that Warminster Heights was constructed by the Federal Government during World War II to provide housing for defense workers. In 1957, the United States Government sold Warminster Heights, formerly known as Lacy Park, to the defendant Bella Angel for three million dollars. At the time of the sale, the defendant Bella Angel executed a mortgage to the United States of America in an amount exceeding two million five-hundred thousand dollars. Approximately $1,-500,000 of this mortgage is still outstanding and is presently owned by the Federal National Mortgage Association, an agency of the United States. Paragraph six of this mortgage provides in part that the mortgagor "will maintain [the] property free from waste or nuisance of any kind, and in good condition, and make all repairs, replacements, improvements and additions which may be necessary to preserve and maintain said property and the value thereof. It shall comply with all valid laws, ordinances, and regulations affecting said property or its use." [32]

The plaintiffs' complaint may be construed to allege that the violations of the covenants of a mortgage financed by an agency of the Federal government give rise to a cause of action under 42 U.S.C. §§ 1401, 1441 and 1441a within the scope of 28 U.S.C. § 1331. Without reaching or attempting to resolve this difficult question, I must face the preliminary issue whether the plaintiffs can satisfy the $10,000 jurisdictional requirement of 28 U.S.C. § 1331. On this question it appears that the decisions of the United States Supreme Court and of Federal appellate courts foreclose the possibility of plaintiffs satisfying this jurisdictional requirement.

■■ First, even assuming that the action is properly maintained as a class action under F.R.C.P. 23(b) (2), "permitting plaintiffs to sue as class does not provide the answer to the question of whether it is proper to aggregate the claims of individual members of the class to reach the requisite jurisdictional amount." Potrero Hill Community Action Com. v. Housing Authority, 410 F.2d 974, 976 (9th Cir., 1969). In *Potrero Hill* a committee representing the tenants in a federally financed, low-rent project in San Francisco brought suit against the San Francisco Housing Authority, contending that an "annual contribution contract" in effect between the United States and the Housing Authority pursuant to 42 U.S.C. § 1410 imposed on the Housing Authority the duty of maintaining the project "in a decent, safe and sanitary condition (while maintaining its low-rent character)" 410 F.2d at 975. The complaint alleged that the Housing Authority had failed and refused to fulfill this contractual duty. Assuming, on the basis of the allegations of the complaint "that a Federal claim is asserted" the appellate court ruled that because aggregation of the individual tenants' claims was impermissible under Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319, (1969) the $10,000 jurisdictional requisite of 28 U.S.C. § 1331 had not been satisfied, and, therefore, the trial court lacked jurisdiction to grant relief to the plaintiffs.[33] Under Snyder v. Harris, *supra* plaintiffs cannot aggregate their claims to meet the statutory jurisdictional amounts, unless they assert a "common and undivided interest."

---

32. Paragraph 6 is found in Mortgage Book No. 1198 at p. 437. Paragraph 12 of the mortgage, found in Mortgage Book No. 1198, page 437, reads as follows: "In the event of any breach by the Mortgagor of any covenant, condition or agreement of this Mortgage or Bond, it shall be lawful for the Mortgagee, its successors and assigns to enter upon all and singular the land, buildings and premises granted by the accompanying Indenture of Mortgage together with the hereditaments and appurtenances, and each and every part thereof and to take possession of the same."

33. Accord: Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir., 1970).

Because in this case, as in *Potrero Hill* and Hahn v. Gottlieb, *supra,* the rights of plaintiff tenants "appear to arise only from the status of each as individual lessee of a portion of the project premises", aggregation of claims under Snyder v. Harris is impermissible.[34] In light of Snyder v. Harris and the cited decisions of various courts of appeals, this Court must conclude that plaintiffs cannot establish jurisdiction under 28 U.S.C. § 1331.

## V. THE HOUSING ACTS OF 1937 AND 1949: JURISDICTION UNDER 42 U.S.C. § 1983.

As an appropriate basis for this Court to grant their requested relief, plaintiffs place principal reliance on 42 U.S.C. § 1983 and its jurisdictional correlative 28 U.S.C. § 1343. But there is a very serious question whether the civil rights statute codified in 42 U.S.C. § 1983 and its jurisdictional adjunct, 28 U.S.C. § 1343 provide an appropriate basis for this Court to grant the requested declaratory judgment that (1) the present thirty day lease signed by tenants of Warminster Heights is unconscionable and void and (2) that in any valid lease entered into between tenants of Warminster Heights and the defendants, a warranty of habitability should be implied.

In view of the severe shortage today of adequate housing in the United States for low and moderate income families, and the profound importance of adequate housing to the health, safety and dignity of each American, it would appear that one of the most fundamental civil rights deserving protection by the Federal Government and the Federal Courts is the right to "a decent home and a suitable living environment."[35] The present case, however, presents a severe test of the ability and the power of this Court to give effect to such a social and civil right, declared to be an object of national policy by Congress and incorporated as a condition of performance in the mortgage contract between the United States Government and the defendants.

The United States Government has the legal right and the social obligation to require that the covenants of the mortgage be fulfilled by the defendants. It does not appear, however, that the United States has taken steps to require strict compliance with the terms of the mortgage covenant. Since the United States is not a party to this action, they have not requested the enforcement of their rights under the mortgage contract.

To find that the mortgage covenants create rights which the tenants may enforce under 42 U.S.C. § 1983, I would have to accept three difficult and novel assumptions: (1) that the sixth covenant of the mortgage contract created enforceable third party beneficiary rights in the tenants of Warminster Heights (as well as in the government as party to the mortgage); (2) that the tenants' third party beneficiary rights are rights created by the contract of a Federal agency in order to effectuate the policy of Congress to employ Federal "funds and credit," 42 U.S.C. § 1401, to provide decent housing for Americans of low and moderate income, and therefore, should be considered rights "secured" by the laws of the United States; and (3) that the use of state judicial process to threaten and to effect eviction from Warminster Heights, as well as the alleged public character of the project, satisfies the state action requirement of the Fourteenth Amendment and of 42 U.S.C. § 1983.

But even if these three novel and difficult assumptions were made, a final and insurmountable jurisdictional

34. Hahn v. Gottlieb, 430 F.2d at 1245, note 1.

35. Housing: Spring Symposium, 32 Law & Contemp. Problems, 189–560 (1967);

New Power for Tenants: The Lessee's Right to A Livable Dwelling, 6 H.Civ. R.Civ.Lib.Law Rev., 193–204 (1970).

obstacle would remain. 42 U.S.C. § 1983 is itself not an independent grant of jurisdiction. The most frequently employed jurisdictional correlative of § 1983 is 28 U.S.C. § 1343.[36] Under the terms of 1343(3), it cannot be said that the National Housing Acts and the mortgage agreement entered into to further the goals of this legislation are laws providing for the "equal rights of citizens" as specified in § 1343(3). Further, though the protection of rights created under the National Housing Acts are basic to any humane concept of social rights in society, these rights do not fall within the definition of civil rights under 1343(4).

## VI. ALLEGED CONSTITUTIONAL VIOLATIONS AND § 1983.

### A. *Warranty of Habitability and Unconscionability.*

■ Other theories of relief under 42 U.S.C. § 1983 also are fraught with difficulties. I recognize the national importance of decent housing for all citizens and I take note on this record of the failure of defendants to fulfill the obligations which they accepted in return for Federal mortgage financing. I am further aware of the difficult and even tragic plight of the plaintiffs in this action who are actually the victims of many cumulative national failures in the provision of decent housing and suitable living environments for our people. Recognizing all of these circumstances, I must conclude that the absence of a warranty of habitability does not constitute a denial of any of the "rights, privileges or immunities" secured by the *Constitution* of the United States as provided in 42 U.S.C. § 1983.

■ The plaintiffs also have asked this Court to find that the lease which tenants of Warminster Heights are required to sign is void as a matter of law as violative of the public policy and laws of the Commonwealth of Pennsylvania and the Fourth and Fourteenth Amendments of the United States Constitution. As previously discussed in regard to the warranty of habitability, the alleged conflict of the lease agreement with the "public policy and laws" of Pennsylvania does not necessarily constitute a denial of a right, privilege or immunity of constitutional dimension.

The plaintiffs challenge the lease as violative of the Fourth and Fourteenth Amendments. This assertion is not developed with sufficient specificity on the present record to enable this Court to fairly determine the scope or merit of the plaintiffs' position on this particular question. The plaintiffs initially contended that the defendants summary termination of the supply of electricity or water to a tenant's apartment in order to coerce payment of back charges constituted a deprivation of property without due process of law in violation of the Fourteenth Amendment. Pursuant to an agreement between the parties approved by this Court on November 23, 1970 this practice of disconnecting the supply of water and electricity to tenants' dwellings has ceased and, therefore, this particular abuse is no longer a matter of dispute between the parties.

### B. *Retaliatory Evictions.*

Finally, the plaintiffs have asked that the defendants be enjoined from evicting tenants in retaliation for reporting housing code violations or for attempting to organize for any lawful purpose. It has been held that "the 14th Amend-

---

36. 28 U.S.C. § 1343 provides that: "The district court shall have original jurisdiction of any civil action * * * (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

ment prohibits a state court from evicting a tenant when the overriding reason the landlord is seeking the eviction is to retaliate for an exercise of his constitutional rights." Hosey v. Club Van Cortlandt, 299 F.Supp. 501 (S.D.N.Y., 1969). At this point, however, it appears that granting injunctive relief would be premature.

■ The present record does not indicate whether the plaintiffs have raised the defense of retaliatory eviction in any state court proceeding. Before this defense is raised and rejected in state court proceedings, it would be inappropriate for this Court to issue an injunction against any threatened retaliatory eviction by the defendant. In Hosey v. Club Van Cortlandt, *supra,* the Court declined to issue an injunction against the retaliatory eviction of a tenant until the validity of this defense under state law had been determined.[37]

## VII. CONCLUSION.

While I find that this Court has no power to grant directly to the tenants a remedy insuring minimum standards of habitability in their dwellings, I do not mean to imply that conditions of neglect at Warminster Heights are uncorrectable. For certainly the mortgagee, the Federal National Mortgage Association, has ample power to enforce its rights arising out of the mortgage agreement signed by the defendants. Certainly when Congress has stated that we must have a decent home and suitable living environment for every American, and when loans are made to reach that goal, it is an extraordinary paradox that a federal agency does not vigorously enforce the standards provided by the

mortgage agreement.[38] Accordingly, the Clerk of this Court will be directed to send a copy of this Opinion to the Secretary of the Department of Housing and Urban Development for his consideration and for reference to responsible officials of the Federal National Mortgage Association.

In light of the foregoing, plaintiffs' request for declaratory relief will be denied with prejudice and defendants' motion to dismiss in this respect will be granted; plaintiffs' motion for injunctive relief will be denied without prejudice.

The foregoing constitutes findings of fact and conclusions of law in accordance with 52 F.R.C.P.

---

37. Accord Hutcherson v. Lehtin, 313 F. Supp. 1324 (N.D.Cal.1970). In Mc-Queen v. Druker, 317 F.Supp. 1122 (D. Mass. 1970) Judge Wyzanski issued an injunction against the retaliatory eviction of tenants from a Federally assisted housing project when it appeared that the state court with landlord-tenant jurisdiction would not consider the defense of retaliatory eviction.

38. The question whether the mandamus provision of 28 U.S.C. § 1361 would provide an appropriate basis for tenants to seek to compel the Secretary of HUD to enforce the provisions of the mortgage agreement signed by the defendants was not raised or considered in the present action. Cf. Hahn v. Gottlieb, 430 F.2d 1243, 1245, n. 1; Byse and Fiocca, Section 1361 of the Mandamus and Venue Act, 81 Harv.L.Rev. 308 (1967).